Eileen A. **CLINTON,** on behalf of herself and as Administratrix of the estate of William A. Champagne, Jr., Plaintiff,

v.

**BROWN & WILLIAMSON HOLDINGS, INC.,** as successor by merger to American Tobacco Company and Philip Morris USA, Inc., Defendants.

No. 05 Civ. 9907(CLB)(LMS).

United States District Court, S.D. New York.

July 24, 2007.

Jerome Howard Block, Levy, Phillips & Konigsberg, LLP, New York, NY, for Plaintiff.

Harold Keith Gordon, Jones Day, Thomas John Quigley, Winston & Strawn LLP, New York, NY for Defendants.

### *Memorandum and Order*

BRIEANT, District Judge.

Before the Court for decision are motions for summary judgment, filed by Defendants Philip Morris USA, Inc., ("Philip Morris") and Brown and Williamson, as successor by merger to American Tobacco Company ("ATC") (Doc.'s 34 and 27).

The following facts appear of record and are assumed to be true for the purposes of this motion only. Plaintiff Eileen Clinton is the widow of decedent William A. Champagne, Jr. Mr. Champagne was born on September 11, 1950 and died from lung

cancer on June 25, 2004 at the age of 3. He started smoking in his early teenage years. He first smoked Lucky Strike Brand cigarettes, manufactured by ATC, and later Marlboro and Marlboro Lights cigarettes, manufactured by Philip Morris. Compl. ¶ 4. In November 2004, shortly after he quit smoking, Mr. Champagne was diagnosed with lung cancer and died approximately seven months later. *Id. at* ¶ 7.

This is a diversity case controlled by New York law. Plaintiff filed her summons and complaint on November 1, 2005 in New York County Supreme Court. Her complaint alleges decades of "fraudulent, misleading and unlawful conduct" on the part of defendant tobacco companies, in an alleged effort to cover up the health hazards of smoking cigarettes. The complaint alleges eleven state law causes of action.[1]

The case was removed to this Court on November 22, 2005, after a filing of a notice of removal by all defendants. By stipulation dated November 30, 2005, Plaintiff voluntarily dismissed all claims against defendants Altria Group, Inc., the Council for Tobacco Research–USA, Inc., and the Tobacco Institute., Inc., pursuant to Fed.R.Civ.P. 41(a)(1)(I). By stipulation dated December 29, 2005, Plaintiff voluntarily dismissed her claim for breach of implied warranty, and her claim for negligent advertising and marketing, to the extent that it occurred after July 1, 1969. (Doc. 11). In her opposition to the present motion, Plaintiff has abandoned her claim for negligent advertising and marketing completely, and her claim for fraudulent misrepresentation. *Pl. Br. 3, n.2.* Plaintiff has also limited her claims for fraudulent concealment and failure to warn, to the time period up to and including September 11, 1968. These two claims are asserted against ATC only. *Id.*

The remaining claims that are the subject of the present summary judgment motion therefore are for 1) failure to warn before September 11, 1968 (against ATC only); 2) fraudulent concealment before September 11, 1968 (against ATC only); 3) design defect; and 4) fraud in marketing "Marlboro Lights" (against Phillip Morris USA only). Defendants also seek summary judgment on the issue of punitive damages. The Court will discuss each of these claims in turn below.

*Failure to Warn*

Plaintiff asserted three causes of action alleging a failure to warn. She asserts these failure to warn claims against ATC[2] only. Plaintiff's third cause of action sounds in strict liability "as a result of inadequate warning up to July 1, 1969." Her fifth cause of action sounds in negligence, alleging "failure to warn in 'advertising or promotion' up to July 1, 1969." Her sixth cause of action also sounds in negligence, alleging failure to warn *outside of* "advertising and promotion." The factu-

1. The causes of action originally stated in her complaint are as follows: 1) Fraud (through Misrepresentation and Concealment); 2) Defective Design (Strict Liability); 3) Product Defect as the Result of Inadequate Warning up to July 1, 1969; 4) Negligent Design and Testing; 5) Negligence—Failure to Warn in "Advertising or Promotion" up to July 1, 1969 (Lucky Strikes); 6) Negligence—Failure to Warn Outside of "Advertising or Promotion"; 7) Negligent Advertising and Marketing; 8) Breach of Implied Warranty; 9) Fraud in Marketing "Marlboro Lights"; 10) Loss of Consortium/Services and Society for Eileen Clinton; 11) Wrongful Death claims on behalf of Eileen Clinton, William Champagne III and Jennifer Clinton.

2. Plaintiff is proceeding against Brown and Williamson based on the alleged misconduct of ATC in connection with its manufacture, sale and marketing of Lucky Strike cigarettes. Although Brown and Williamson is the moving party, the Court will refer uniformly to defendant as ATC throughout the decision.

al basis for each of these failure to warn claims is essentially the same. As she states in her Memorandum in Opposition to Defendant's Motion for Summary Judgment:

"Plaintiff seeks to hold defendant American Tobacco liable for failure to warn for the time period up to and including September 11, 1968 at which time Mr. Champagne turned 18 years of age. This claim takes aim at the egregious failure of American Tobacco to warn children about the deadly hazards of smoking. American Tobacco knew that up to 90% of smokers begin smoking as teenagers, yet they failed to warn teenagers like Mr. Champagne about the specific and deadly hazards of cigarette smoking." *Pl. Mem.,* 28.

Defendant ATC argues that Plaintiff's failure to warn claim should be dismissed. First, ATC claims that it had no duty to warn of the risks of smoking, because information about these risks was widely available since at least the 1950's, and reasonably discoverable by Mr. Champagne. Second, ATC argues that even if it did have a duty to warn, any alleged failure to warn was not the proximate cause of Mr. Champagne's injuries, because he continued to smoke after legally adequate warnings about tobacco's dangers were given.

■■■ For the purposes of this motion, the analysis of each of Plaintiff's failure to warn claims is the same.[3] Under New York law, a product manufacturer may be liable for its "failure to warn of the risks and dangers associated with the use of its product. That duty generally extends to warning ultimate consumers of the dangers resulting from the foreseeable use of the product." *Urena v. Biro Mfg. Co.,* 114 F.3d 359, 366 (2d Cir.1997) (citing *Polimeni v. Minolta Corp.,* 227 A.D.2d 64, 65–66, 653 N.Y.S.2d 429 (3d Dep't 1997); *Bukowski v. CooperVision Inc.,* 185 A.D.2d 31, 592 N.Y.S.2d 807 (3d Dep't 1993)). For the reasons stated below, the Court concludes that Plaintiff has offered sufficient evidence to defeat ATC's motion for summary judgment on the issue of whether it had a duty to warn of the dangers of smoking, as well as on the issue of proximate cause.

■■ Although ATC claims that the information about the dangers of smoking were widely disseminated and easily discoverable, several New York Courts have concluded, based on similar evidence presented here by Plaintiff, that the issue was at least one for the jury. *See Standish–Parkin v. Lorillard Tobacco Co.,* 12 A.D.3d 301, 302, 786 N.Y.S.2d 13 (3d Dep't 2004) ("Plaintiff presented sufficient evidence to raise triable issues of fact as to the state of the public's common knowledge of the risks of cigarette smoking prior to 1969.") *See also Miele v. American Tobacco Co.,* 2 A.D.3d 799, 804–805, 770 N.Y.S.2d 386 (2d Dep't 2003). Plaintiff offers evidence that Tobacco companies were aware of the carcinogenic and addictive nature cigarettes, but at that time were publicly disputing contentions regarding the those health hazards. This Court concludes, as have several New York courts, that the issue of

---

**3.** Failure to warn claims purporting to sound in strict liability and those sounding in negligence are essentially the same. *See Fane v. Zimmer, Inc.,* 927 F.2d 124, 130 (2d Cir.1991)(applying New York law.) Furthermore, the distinction between failure to warn *in,* as opposed to *outside of,* advertising or promotion, was presumably intended to encompass conduct occurring after the enactment of the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331 *et seq.* Plaintiff has now abandoned any claim for failure to warn after September 11, 1968. In any event, the distinction would not provide a separate ground for recovery.

whether ATC had a duty to warn is one for the jury, because "[b]ased upon the conflicting evidence presented, a reasonable juror could conclude that, at best, there was great confusion as to the hazardous effects of smoking." *Miele at* 802.

ATC also argues that, even if it did have a duty to warn of the health hazards of smoking, any alleged failure to warn would not have been the proximate cause of Mr. Champagne's injuries, because Mr. Champagne continued smoking for many years after federally mandated warnings (which are adequate as a matter of law) were given to consumers.

 In order for the Plaintiff to recover on her failure to warn claim, "the failure to warn must have been a substantial cause of the events which produced the injury" *Billsborrow v. Dow Chemical, U.S.A.,* 177 A.D.2d 7, 16, 579 N.Y.S.2d 728 (2d Dep't 1992). "Generally, proximate cause is a question to be decided by the trier of the facts." *Nagel v. Brothers Intern. Food, Inc.,* 34 A.D.3d 545, 548, 825 N.Y.S.2d 93 (2d Dep't 2006). The Court concludes that Plaintiff has presented sufficient evidence that ATC's alleged failure to warn was the proximate cause of Mr. Champagne's injuries. The record includes evidence that Mr. Champagne became addicted to cigarettes at a young age, allegedly without knowing that cigarettes were addictive or harmful, and before adequate warnings were placed on cigarette packs or anywhere else. As the New York Supreme Court, New York County, has held:

> It may be argued that the decedent's continued use of tobacco products for approximately twenty-eight years after warning labels were first affixed to cigarette packages destroys the contention that the alleged failure to warn proximately caused her injury. The court rejects this argument because it over-

looks the element of addiction ... In the case at bar, the decedent allegedly learned of the carcinogenic properties of cigarettes at a time when addiction allegedly prevented her from acting upon that knowledge. Whether the decedent was actually addicted to cigarettes is itself a question of fact, and the court cannot rule here as a matter of law that the defendant manufacturers' alleged failure to warn was not the proximate cause of the decedent's injuries. *Inzerilla v. The American Tobacco Company, et al.,* 2000 WL 34016364, *at* *6 (N.Y.Sup.Ct.2000).(emphasis added).

Defendant ATC's motion for summary judgment as to Plaintiff's failure to warn claims is denied.

*Fraudulent Concealment*

In her first cause of action, Plaintiff asserted a fraudulent concealment claim against both Defendants. Plaintiff subsequently limited this claim to the time period up to September 11, 1968. This claim is now directed against ATC only. ATC argues that summary judgment should be granted and the claim dismissed.

 ATC first argues, as it did in regard to the failure to warn claim, that it could not have fraudulently concealed public information. This is supported by its contention, noted above, that the dangers of smoking were widely known and discoverable when Mr. Champagne started smoking. ATC also argues, again as it did in regard to the failure to warn claim, that any concealment could not have been the proximate cause of Mr. Champagne's injuries, because he failed to quit after adequate information was available. These arguments fail to support summary judgment on this claim for the same reasons that they fail in regard to the failure to warn claim. There is sufficient evidence to create a jury question on the issues of

the public's knowledge of the health hazards of smoking, and on proximate cause.

Additionally, ATC argues that Plaintiff has failed to show the elements of reliance and fraudulent intent necessary to her claim. However, Plaintiff has offered evidence, through the expert reports of K. Michael Cummings and Neil E. Grunberg, showing that Tobacco companies knew about the health hazards of smoking, and yet publicly denied that cigarettes were addictive or caused cancer. Plaintiff has clearly set forth sufficient evidence to create questions of fact for the jury to determine on the issues of reliance and intent.

*Design Defect*

Plaintiffs second and fourth causes of action allege design defect[4] claims against both ATC and Phillip Morris. Plaintiff claims that Defendants' cigarettes are "by design, a highly lethal product—one that is both highly addictive and delivers an excessive amount of carcinogens when smoked by humans." Compl. ¶¶ 123, 135, 136. Plaintiff claims that Defendants had a duty, and were able, to develop a cigarette that was "safer", i.e., a cigarette that "(1) was significantly less addictive and/or not addictive at all; and/or (2) a cigarette that delivered substantially less carcinogens when smoked by a human." Compl. ¶¶ 122, 134.

Defendants move for summary judgment to dismiss Plaintiff's design defect claims. First, they argue that Plaintiff has failed to satisfy the threshold requirement of offering proof of a feasible alternative design. They argue that Plaintiff's proffered "reduced carcinogen", and "non-addictive" designs are simply not functional equivalents to the cigarettes that Plaintiff claims were defective. Second, they argue

that, even if these designs were feasible and functionally equivalent, Plaintiff has failed to establish proximate cause, because there is no evidence that Plaintiff's husband would have smoked these supposedly safer cigarettes. Finally, Defendants argue that the design defect claims are barred by the doctrine of conflict preemption, because it seeks to effectively ban cigarettes that have the inherent characteristics of tar and nicotine. Because the Court agrees with Defendants that Plaintiff has failed to offer a feasible alternative design to the cigarettes that Mr. Champagne smoked, the Court need not reach the latter two arguments.

The requirements for establishing a *prima facie* design defect claim under New York law are outlined in *Voss v. Black & Decker Mfg. Co.* 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983). In that case, the New York Court of Appeals held that "[i]n order to establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiffs injury." *Id.* at 107–108, 463 N.Y.S.2d 398, 450 N.E.2d 204. The court went on to explain that "the proper standard to be applied should be whether the product as designed was 'not reasonably safe'—that is, whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* at 108, 463 N.Y.S.2d 398, 450 N.E.2d

---

4. The second cause of action is strict liability defective design, while the fourth cause of action is a claim for defective design sounding in negligence. For the purposes of this mo-

tion, the analysis is the same. *See Denny v. Ford Motor Company,* 87 N.Y.2d 248, 257–258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995).

204. The Court of Appeals held that the risk/utility analysis described above is one for the jury, and that in making its determination, the jury may consider several nonexclusive factors, including:

(1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product—that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design. *Id.* at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204.

■ As an initial matter, the Court must determine whether the existence of a feasible alternative design is a *sine qua non* of the design defect claim, as Defendant argues, or whether it is merely one of several nonexclusive factors to be considered by the factfinder, as the Plaintiff argues. In making their arguments, both sides have reasonably relied upon language in *Voss* that appears to support their contentions. For the reasons stated below, the Court concludes that proof of a feasible alternative design is a prerequisite to establish a prima facie design defect claim under New York law.

Although "the availability of a safer design" is listed by the court in *Voss* among several "nonexclusive" factors to be considered by the jury, the court in *Voss* also clearly stated that "[t]he plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was

a substantial likelihood of harm *and it was feasible to design the product in a safer manner.*" *Voss* at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (emphasis added). This language indicates that the existence of a feasible alternative design is not just a "nonexclusive" factor, but rather is a requirement for Plaintiff's prima facie case. Accordingly, New York courts have required Plaintiffs to demonstrate the feasibility of a safer alternative design to establish a prima facie design defect case. *See Felix v. Akzo Nobel Coatings Inc.*, 262 A.D.2d 447, 449, 692 N.Y.S.2d 413 (2d Dept., 1999) (granting summary judgment because "there was no competent evidence set forth by the plaintiff that there was an alternative, safer design and the evidence clearly indicates that the volatile solvent contained in the defendant's quick-drying lacquer sealer is critical to the products' performance."). *See also Restatement (Third) of Torts,* § 2(b) ("A product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided *by the adoption of a reasonable alternative design* by the seller or other distributor.")(emphasis added).

■ Having held that proof of a feasible alternative design is a required element of a prima facie design defect claim under New York law, the Court must determine whether or not the alternative designs offered by Plaintiff satisfy the requirement. The Court concludes that the alternative designs offered by Plaintiff cannot satisfy her requirement of showing that "it was feasible to design the product in a safer manner." *Voss* at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204.

Plaintiff offers, through the testimony of her expert William A. Farone, Ph.D., two alternative cigarette designs that she claims were safe and feasible alternatives to the Marlboro and Lucky Strike ciga-

rettes that Plaintiff claims killed her husband. These are: 1) Reduced Carcinogen Cigarettes; and 2) Non–Addictive Cigarettes.[5]

Plaintiff claims that "Reduced Carcinogen" cigarettes are indisputably safer alternative designs, because the evidence shows that they substantially reduce the amount of tar and other cancer-causing carcinogens to which a smoker is exposed. Dr. Farone states in his expert report that "[i]t was technologically feasible for defendants to design a cigarette which delivered a dramatically lower amount of tar." *Farone report*, 8. In fact, Dr. Farone states in his report that Defendants actually manufactured reduced carcinogen cigarettes. According to Dr. Farone's report, in 1976 ATC introduced the "Carlton Red Box" brand, "which delivered virtually no tar." *Id.* Similarly, in 1979, Philip Morris developed the "Original Lowest Cambridge" brand, "which delivered dramatically less tar and nicotine to smokers as compared to any Marlboro cigarette ever sold." *Id.* Dr. Farone opines in his report that:

> Defendants developed zero tar, or nearly zero tar, cigarettes based on two simple design parameters: ventilation and resistance to draw. First, they diluted the mainstream smoke with more than 90% air that would enter the filter through the ventilation holes. This was a high degree of ventilation in comparison to Marlboro Lights which diluted the smoke only 30–40%. Second, they designed the filter to have a higher resistance to draw to prevent full compensation by the smoker, unlike Marlboro lights which allowed the smoker to fully compensate. These design parameters were long available to defendants and nothing prevented the design of a zero

tar, or almost zero tar, cigarette which did not permit the smoker to significantly compensate in earlier decades. *Id.* at 9.

Plaintiff's other proffered alternative design is a "non-addictive" cigarette. Dr. Farone states in his report that since the 1950's, "it was technologically feasible to manufacture a cigarette that delivered an amount of nicotine that was insufficient to initiate and sustain addiction." Plaintiff argues that Defendants instead designed cigarettes that delivered excessive amounts of nicotine for the very purpose addicting those who used their product, even though they knew that most smokers began smoking when they were teenagers.

The Court notes that a design defect claim asserted against cigarette manufacturers does not fit comfortably within *Voss's* risk/utility balancing test. Defendants understandably wish to avoid having to make the awkward argument that their product's "utility" outweighs its risk, when their product is known to "sicken and kill hundreds of thousands of Americans each year for the 'benefit' of satisfying an addiction." David G. Owen, *Inherent Product Hazards*, 93 Ky. L.J. 377, 381–382 (2004–2005). For this reason, during the early waves of lawsuits against tobacco companies for product liability, the majority of courts and commentators put cigarettes in the category known as "unavoidably unsafe products", or products that "in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use." Restatement (Second) of Torts § 402A *comment i. See also* Owen, *supra* at 393–95. Products that are included in this category are generally exempt from liability based

---

**5.** Originally, Plaintiff's design expert Dr. William Farone proffered four alternative designs. However, in opposition to the pending motion, Plaintiff has only offered these two as feasible design alternatives.

on a theory of design defect "because their risks cannot be removed without destroying their utility." Owen, *supra* at 380.

In its Reply Memorandum, Defendant Philip Morris invites the Court to dismiss the design defect claim outright, based on the additional ground of this "inherently dangerous product" safe harbor. It cites numerous cases where New York courts have found that design defect claims failed as a matter of law because the dangers of the product were inherent, open and obvious. *Def. Rep. Mem. 2, n. 3* (citing *Biss v. Tenneco, Inc.* 64 A.D.2d 204, 207, 409 N.Y.S.2d 874 (4th Dep't 1978)) (construction equipment); *Ng v. Barnes & Noble, Inc.,* 308 A.D.2d 340, 341, 764 N.Y.S.2d 183 (1st Dep't 2003) (handgun). However, the Court need not explicitly designate cigarettes as being in this safe harbor, because Plaintiff's alternative designs fail to establish a prima facie design defect claim under *Voss.*

Plaintiff has not shown that "it was feasible to design [cigarettes] in a safer manner", as was contemplated by the New York Court of Appeals in *Voss.* As all parties recognize, the "reduced carcinogen" and "non-addictive" cigarette designs were indisputably rejected by consumers. This is because they are plainly not feasible alternative designs in any meaningful sense. Rather, they are offered in an attempt to use a design defect claim to impose state law tort liability on the manufacture and sale of virtually every cigarette now on the market. A state law requirement that allows only cigarettes with no tar or no nicotine to be sold is a virtual ban on cigarettes, just as a requirement that allows only "alcohol-free" liquor to be sold would be a ban on whiskey. As one commentator has noted, "the vast majority of courts have been markedly unreceptive to the call that they displace markets, legislatures, and governmental agencies by decreeing whole categories of products to be 'outlaws.'" Owen, *supra,* at 377, 383. This is exactly the type of claim that *Voss's* alternative feasible design requirement was meant to disallow.

Defendants' motion for summary judgment on Plaintiff's design defect claim is granted.

*Fraud in Marketing Marlboro Lights*

Plaintiff's ninth cause of action, asserted against Philip Morris only, is for "Fraud in Marketing 'Marlboro lights.'" Plaintiff alleges that Philip Morris made public statements that falsely stated, suggested, or implied that Marlboro Lights were less harmful to smokers' health than full flavored cigarettes. Plaintiff claims that these statements were false because, while Marlboro Lights were designed to deliver less tar and nicotine when "smoked" by a testing machine, they in fact delivered as much, if not more tar and nicotine when smoked by a human, through unconscious "compensation".[6] Compl. ¶ 186. Plaintiff claims that Philip Morris knew these statements were false, and in fact purposely designed Marlboro Lights to allow smokers to draw excess smoke, and therefore excess tar and nicotine.

Philip Morris moves for summary judgment on this claim. First, it argues that Plaintiff's claim is expressly preempted by the Federal Cigarette Labeling and Advertising Act ("the Labeling Act"). (15 U.S.C. §§ 1331 *et seq.*) Philip Morris argues that, even if the claim is not expressly

---

6. As another District Court in a similar case has explained, "[e]xamples of compensatory behavior include unconsciously covering invisible 'ventilation holes' in the filter paper, smoking the cigarettes more intensely, inhaling more deeply, and holding the smoke in the lungs for a longer time period." *Good v. Altria Group, Inc.,* 436 F.Supp.2d 132, 137 (D.Me.2006).

preempted, it is barred under the doctrine of conflict preemption, because such a state law claim would stand as "an obstacle to the accomplishment and execution of the full purposes of Congress"—specifically, to the FTC's longstanding regulatory scheme of tobacco advertising.

The Labeling Act explicitly addresses the issue of state law preemption. The preemption provision of the Labeling Act, contained in § 5(b), provides that:

"No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b)

Both Plaintiff and Philip Morris agree that the proper starting point for analysis of the Labeling Act's express preemption provision is the Supreme Court's decision in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

In *Cipollone,* a smoker and her spouse sued cigarette manufacturer defendants after the smoker developed lung cancer. Plaintiffs brought claims against defendants for, among other things, failure to warn, breach of express warranty, and fraudulent misrepresentation. The Supreme Court granted certiorari on the issue of whether the Labeling Act (or its 1965 predecessor) "preempted petitioner's common-law claims against respondent cigarette manufacturers." *Id.* at 504, 112 S.Ct. 2608.

*Cipollone* is a divided opinion, with only three justices joining Justice Stevens in parts five and six of the opinion. The plurality concluded as a preliminary matter that the Labeling Act applied to state common law actions as well as state statutes and injunctions. Quoting the statute, Justice Stevens wrote that: "[t]he phrase

'[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules." *Id.* at 521, 112 S.Ct. 2608. Having concluded that the preemptive effect of § 5(b) applied to state common-law actions, the plurality then cautioned that not all common-law claims were preempted. "For purposes of § 5(b), the common-law is not of a piece." *Id.* at 523, 112 S.Ct. 2608. Instead, the plurality determined that it "must look to each of petitioner's common-law claims to determine whether it is in fact preempted." *Id.* at 523–524, 112 S.Ct. 2608. Justice Stevens then outlined the approach to be taken in this case-by-case analysis:

The central inquiry in each case is straightforward: we ask whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion,' giving that clause a fair but narrow reading. *Id.* at 524, 112 S.Ct. 2608 (quoting the Labeling Act.)

The plurality went on to apply this "straightforward" inquiry to each of the plaintiffs' claims. Its analysis of the plaintiffs' fraudulent misrepresentation claim is the most relevant for the purposes of this motion. The plurality recognized that plaintiffs had alleged two theories of that tort, and therefore examined each separately. The first theory was that the manufacturers had "through their advertising, neutralized the effect of federally mandated warnings." *Id.* at 527, 112 S.Ct. 2608. The plurality concluded that a prohibition on glamorized promotional materials "is merely the converse of a state-law *requirement* that warnings be included in advertising and promotional materials." *Id.* at

527, 112 S.Ct. 2608 (emphasis in the original). It concluded that this theory of fraudulent misrepresentation was "inextricably related to petitioner's first failure-to-warn theory, a theory that we have already concluded is largely preempted by § 5(b)." *Id.* at 528, 112 S.Ct. 2608.

Justice Stevens went on to examine Plaintiffs' second theory of fraudulent misrepresentation, which is framed in language similar to the claim Plaintiff asserts in the present case. This second theory alleged "intentional fraud and misrepresentation both by 'false representation of a material fact [and by] conceal[ment of] a material fact.'" *Id.* at 528, 112 S.Ct. 2608. The Court held that Plaintiff's claim for fraudulent misrepresentation based on false representation, or concealment, of a material fact was not preempted by § 5(b). Justice Stevens explained that "[t]he predicate of this claim is a state-law duty not to make false statements of material fact or to conceal such facts." *Id.* at 528, 112 S.Ct. 2608. Even though the claim arose with respect to advertising and promotion, the plurality concluded that "[s]uch claims are predicated not on a duty 'based on smoking and health' but rather on a more general obligation-the duty not to deceive." *Id.* at 528–29, 112 S.Ct. 2608.

Justice Stevens explained that this conclusion was appropriate for two reasons. "First, in the 1969 Act, Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud." *Id.* at 529, 112 S.Ct. 2608. Second, he explained that:

> "this reading of 'based on smoking and health' is wholly consistent with the purposes of the 1969 Act. State-law prohibitions on false statements of material fact do not create 'diverse, nonuniform, and confusing' standards. Unlike state-law obligations concerning the warning necessary to render a product 'reasonably

safe,' state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity. Thus, we conclude that the phrase 'based on smoking and health' fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements. Accordingly, petitioner's claim based on allegedly fraudulent statements made in respondents' advertisements is not preempted by § 5(b) of the 1969 Act". *Id.*

The analysis of § 5(b) and the test created in *Cipollone* garnered only four votes. However, the decision is widely followed in other circuits. *See Brown v. Brown & Williamson Tobacco Corp.*, 479 F.3d 383, 389 (5th Cir.2007) (citing *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142 (9th Cir.2005); *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183 (11th Cir.2004); *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343 (6th Cir.2000); *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58 (1st Cir. 1997)).

Whether Plaintiff's claims for fraud in marketing Marlboro Lights is expressly preempted therefore depends on which of the two categories of fraudulent misrepresentation the claim falls. If Plaintiff's claim is that marketing the cigarettes as "lights" that were "lower in tar and nicotine" essentially neutralized federally mandated warnings, then the claim is expressly preempted by 5(b), because it would be "merely the converse of a state-law requirement that the warning be included in advertising and promotional materials." *Id.* at 527, 112 S.Ct. 2608. If, on the other hand, the Court determines that Plaintiff's claim is predicated on a "state-law duty not to make false statements of material fact or conceal such facts," then 5(b) does not preempt it, because "[s]uch claims are predicated not on a duty 'based on smoking and health' but rather on ... the duty

not to deceive." *Id.* at 528–29, 112 S.Ct. 2608.

 The Court agrees with the reasoning contained in the recent federal court decisions, cited below, and holds that Plaintiff's claim for fraudulent misrepresentation in marketing Marlboro Lights is expressly preempted by § 5(b) of the Labeling Act, because it seeks to impose a "prohibition based on smoking and health ... under State law with respect to the advertising or promotion." *Id.* Specifically, Plaintiff seeks to prohibit the use of terms that describe the FTC-approved testing process, because they give the "false impression that Marlboro Lights would provide the smoker with less tar and nicotine." *Pl. Mem.* 37. Plaintiff argues that her fraud in marketing Marlboro Lights falls squarely within that category that the *Cipollone* Court held not to be preempted, because it "is premised upon the legal 'duty not to deceive,' not upon a 'state law requirement or prohibition' related to 'smoking and health.'" *Id.* The Court concludes, as did the District Court in a recent similar case, that while such a claim may be "a valiant attempt to tailor [her] claims to fit within the *Cipollone* exception for violations of the duty not to deceive", such an attempt must fail. *Good v. Altria Group, Inc.,* 436 F.Supp.2d 132, 151 (D.Me.2006).

In *Good v. Altria, Inc.,* Plaintiff smokers claimed that Philip Morris's use of the terms "light" and "lowered tar and nicotine" were misrepresentations under Maine Law. 436 F.Supp.2d 132. Plaintiffs in that case, much like the Plaintiff in this case, claimed that Phillip Morris purposely designed Marlboro lights in order to "dilute the tar and nicotine content of smoke per puff as measured by the industry standard testing apparatus, but not when used by the consumer." *Id.* at 144. They claimed that, among other things, Phillip

Morris's use of the terms "light" and "lowered tar and nicotine" was false and misleading. *Id.* The District Court in *Good* discussed in detail the FTC's regulation of tobacco advertising, particularly of the method used to test tar and nicotine levels, known as the "FTC method", or "Cambridge Method." The Court determined that Plaintiff's claim fell into the expressly preempted "neutralization" category because:

> "the Plaintiffs point to no Philip Morris representation about light cigarettes inconsistent with what the FTC condoned; no evidence Philip Morris ever affirmed that light cigarettes were good for you, were healthy, or would not cause the host of physical problems listed on every package; no evidence that any descriptors Philip Morris applied to Marlboro Lights and to Cambridge Lights contravened what the FTC and Congress knew the tobacco companies as a group and Philip Morris in particular were saying about these cigarettes." *Id.* at 152.

More recently, the Fifth Circuit Court of Appeals came to the same conclusion. In *Brown v. Brown and Williamson,* 479 F.3d 383 (5th Cir.2007), which was decided after the submission of this motion, the Fifth Circuit held that:

> While claims based on "fraud by intentional misstatement" are not pre-empted because Congress did not intend to "insulate" manufacturers from state liability for affirmative lies, the use of FTC-approved descriptors cannot constitute fraud. Cigarettes labeled as "light" and "low-tar" do deliver less tar and nicotine as measured by the only government-sanctioned methodology for their measurement. In fact, the Manufacturers are essentially forbidden from making any representations as to the tar and nicotine levels in their marketing about tar that are not based on the FTC meth-

od. The terms "light" and "lowered tar and nicotine" cannot, therefore, be inherently deceptive or untrue.

The Court notes that Plaintiff, in a letter sent to the Court after this motion was fully submitted, disputes the factual basis for the decisions in *Good v. Altria Inc.*, and *Brown v. Brown and Williamson.* Both decisions discussed the role the FTC took in regulating tobacco advertising, especially the regulation of advertising of tar and nicotine levels. The panel in *Brown* accepted as undisputed that tobacco companies "would risk a deceptive advertising claim if they failed to advertise tar and nicotine levels in accordance with the FTC method." *Brown* at 396, n. 6. The panel also cited *Good,* stating that "[w]hat the *Good* opinion makes clear is that to impose state liability on the basis of the Manufacturers' use of the FTC mandated terms is necessarily to impose a state requirement or prohibition on cigarette advertising as it relates to the relationship between cigarettes and health." *Brown* at 393.

Plaintiff disputes the factual conclusion that the FTC somehow required cigarette makers to use the "mandated" terms that Plaintiff claims were fraudulent. Plaintiff argues that "[n]obody—not the FTC, the United States Congress or anyone else—forced Philip Morris to put 'lowered tar and nicotine' on packs of Marlboro Lights. Philip Morris chose to do this for the purpose of deceiving people like Mr. Champagne." *Pl. Mem.* 45.

In support of this argument, Plaintiff cites the *Amicus Curiae* brief submitted by the Solicitor General to the Supreme Court in the appeal of *Watson v. Philip Morris Companies, Inc.,* 420 F.3d 852 (8th Cir.2005). The Supreme Court granted certiorari in that case, on January 12,

2007. —— U.S. ——, 127 S.Ct. 1055, 166 L.Ed.2d 797.[7] In his brief, the Solicitor General addressed the issue of whether the FTC's role in regulating advertising by tobacco companies was sufficient to establish that a company was "acting under" a federal officer for purposes of the federal officer removal provision in 28 U.S.C. 1442(a)(1), when the tobacco company marketed cigarettes as "light." In the brief, the Solicitor General made statements suggesting a less assertive role by the FTC in regulating descriptive terms such as "lights". However, that case deals with the issue of whether Tobacco companies were "controlled" by the federal government in using such descriptive terms. Even if the court in *Brown* overstated the involvement of the FTC in promulgating, or "mandating", the terms "lights" or "lowered in nicotine and tar", there is no dispute that the FTC has declined to *disallow* those terms in response to several invitations to do so. There is also no dispute that the allegedly misleading terms accurately describe the results of the FTC testing method.

For the reasons stated above, Philip Morris's summary judgment motion as to the Fraud in Marketing Marlboro Lights claim is granted.

*Punitive Damages*

Defendants argue that Plaintiff's claims for punitive damages are barred by the doctrine of *res judicata.* Specifically, Defendants argue that Plaintiff's claim for punitive damages is barred by a settlement agreement between the State of New York and Defendants, which resolved a *parens patriae* suit filed by the New York Attorney General.

**7.** The Supreme Court reversed the Eighth Circuit on June 11, 2007, holding that the FTC's regulations did not bring Philip Morris's actions under the scope of § 1442(a)(1)'s term "acting under." —— U.S. ——, 127 S.Ct. 2301, 168 L.Ed.2d 42.

In 1997, New York's Attorney General, along with other Attorneys General in States across the country, filed suit against major cigarette manufacturers, including Defendants. On November 23, 1998, New York, along with 45 other states, executed a Master Settlement Agreement ("MSA") with the nation's major tobacco companies. This settlement was reduced to a Consent Decree and Final Judgment, and upheld on appeal.

▆▆▆ Under New York law, "[t]he doctrine of res judicata bars litigation between the same parties, or others in privity, of any cause of action arising out of the same transaction which either was or could have been asserted in the prior proceeding." *State v. Town of Hardenburgh*, 273 A.D.2d 769, 772, 710 N.Y.S.2d 435 (2d Dep't 2000). The parties do not appear to dispute that the allegations in the *parens patriae* suit and those in current suit are the same. Both the State's and this Plaintiff's complaint alleged that the major tobacco companies engaged in a pattern of fraudulent behavior since the 1950's, in attempting to sow doubt as to the harmful effects of smoking. The issue is, therefore, whether the privity requirement is satisfied.

Defendants argue that the MSA is binding on Plaintiff: "Here, because the New York Attorney General expressly brought the State's action in his *parens patriae* capacity, and because punitive damages vindicate public rights, Plaintiffs, as citizens of the State of New York, were in privity with the New York Attorney General and all of the requisites for the application are met." Def. Br. 22.[8]

▆▆▆ "Punitive damages are 'intended as punishment for gross misbehavior for the good of the public.'" *Trudeau v. Cooke*, 2 A.D.3d 1133, 1134, 769 N.Y.S.2d 322 (3d Dep't 2003) (quoting *Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 203, 551 N.Y.S.2d 481, 550 N.E.2d 930 (1990)). The New York Court of Appeals has held that "[p]unitive damages is a sanction reserved to the State, a public policy of such magnitude as to call for judicial intrusion to prevent its contravention." *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 356, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976).

▆▆▆ Plaintiff does not dispute that the New York Attorney General brought the *parens patriae* suit in order to vindicate the public interest against the same Defendants, and for the same alleged harms committed against the public, as Plaintiff asserts in this case. She seems to argue however, that she retains some private interest in punitive damages above and beyond what was already vindicated. The Court concludes that this argument conflicts with the purpose of punitive damages in New York, since "enforcement of an award of punitive damages as a purely private remedy would violate strong public policy." *Garrity* at 356, 386 N.Y.S.2d 831, 353 N.E.2d 793.

The Court concludes, for the reasons above, that Plaintiff's claim for punitive damages are barred by res judicata.

### Conclusion

Brown and Williamson's motion for summary judgement (Doc. 27) on Plaintiff's claims for failure to warn and fraudulent concealment is denied, and is granted in all other respects. Philip Morris's motion for summary judgment (Doc. 34) is granted in its entirety. Plaintiff's claim for punitive damages is barred. The Court declines to

---

**8.** This quote is contained in Philip Morris's brief in the related case *Grill v. Philip Morris USA, Inc.*, 05 Civ. 9174(CLB).

make the findings contemplated by Rule 54(b) of the Federal Rules of Civil Procedure.

A status conference of counsel with the Court will be held on September 28, 2007 at 10:00 A.M.

SO ORDERED.