# United States Court of Appeals
## For the First Circuit

No. 06-1965

STEPHANIE GOOD, LORI A. SPELLMAN and ALLAIN L. THIBODEAU,
individually and on behalf of all others similarly situated,

Plaintiffs, Appellants,

v.

ALTRIA GROUP, INC., and PHILIP MORRIS USA INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Howard, Circuit Judge,

Selya, Senior Circuit Judge,

and Shadur,* Senior District Judge.

Todd S. Heyman, with whom Thomas V. Urmy, Jr., Shapiro Haber
& Urmy, LLP, Gerard V. Mantese, Mark C. Rossman, Mantese and
Associates, P.C., Samuel W. Lanham and Cuddy & Lanham, were on
brief, for appellants.
Kenneth J. Parsigian, with whom Goodwin Procter LLP, H. Peter
Del Bianco, Jr., Lambert Coffin, Guy Miller Struve and Davis Polk
& Wardwell, were on brief, for appellees.

August 31, 2007

*Of the Northern District of Illinois, sitting by designation.

**HOWARD**, **Circuit Judge**.  The plaintiffs appeal from the entry of summary judgment for the defendants, Philip Morris USA Inc. and its parent company (collectively, "Philip Morris"), on state-law claims based on the marketing of "Light" cigarettes.[1] The district court ruled that these claims were preempted by the Federal Cigarette Labeling and Advertising Act (the "FCLAA"), which provides that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b) (1998).  Because we find that the claims are not preempted, and because Philip Morris's alternative arguments for affirmance are also unavailing, we vacate the decision of the district court and remand for further proceedings.

**I.**

The plaintiffs, who say they have smoked Marlboro Lights for at least fifteen years, claim that Philip Morris has employed unfair and deceptive practices in "designing, manufacturing, promoting, marketing and selling Marlboro Lights and Cambridge

---

[1]The parent company, Altria Group, Inc., did not join in the summary judgment motion, seeking to preserve a defense based on lack of personal jurisdiction.  Nevertheless, the district court observed that "the parties acknowledged as a practical matter that the Court's ruling would be equally applicable to Altria."  436 F. Supp. 2d 132, 134 n.4 (D. Me. 2006).  Judgment was therefore entered in favor of both Altria and Philip Morris, without objection from either side.

Lights purporting to be 'light' and having 'Lowered Tar and Nicotine,' all while [it] knew those cigarettes would not deliver less tar or nicotine to the consumer."[2] These brands have rings of ventilation holes in their filters, causing air to mix with the smoke as the smoker draws on the cigarette. As a result, "Lights" register lower levels of tar and nicotine than their so-called "full-flavor" counterparts under a test known as the "Cambridge Filter Method." This test uses a machine to "smoke" a cigarette, collecting the resulting tar and nicotine in a filter for weighing.

The plaintiffs allege that a person smoking "light" cigarettes, however, engages in unconscious behaviors that essentially negate the ventilation effect, such as taking more frequent, voluminous, or longer puffs, covering the air holes with the lips or the fingers, or smoking additional cigarettes. Due to such "compensation," which the plaintiffs attribute to the addictive nature of nicotine, they assert that a smoker consumes the same quantities of tar and nicotine from light cigarettes as from full-flavored ones. The plaintiffs explain that the relative levels of these substances bear on a reasonable consumer's decision on which cigarette to purchase because consumers understand that reducing the quantities of tar and nicotine in cigarettes reduces

---

[2]Philip Morris's expert witness, in his affidavit submitted in support of its motion for summary judgment, explained that "[t]he terms 'light[s]' and 'low tar' are generally viewed as interchangeable" and that, since the early 1970s, "light" has been "associated with both lighter taste and low tar."

their adverse health effects.  Thus, the plaintiffs allege that Philip Morris has misrepresented material facts by describing its "Lights" as such or as having "lower tar and nicotine," and that Philip Morris--which was aware of the "compensation" phenomenon before it began marketing its "Lights" brands--did so with the intent to deceive.

The plaintiffs claim that these misrepresentations amount to unfair or deceptive acts or practices in violation of the Maine Unfair Trade Practices Act.[3]  Me. Rev. Stat. Ann. tit. 5, § 207 (2002).  This statute entitles any person who suffers a loss of money or property as a result of such acts or practices to sue for "actual damages, restitution and for . . . other equitable relief." Id. § 213(1).  The plaintiffs have expressly disclaimed any "damages for personal injuries," but they do seek other relief, including the return of the sums they paid to purchase Marlboro Lights and Cambridge Lights, in addition to punitive damages and the attorneys' fees as authorized by the Act.[4]  The plaintiffs also

---

[3]The amended complaint also alleges that Philip Morris manipulated the design of its light cigarettes "to register Lowered Tar and Nicotine levels under machine testing conditions while actually delivering higher levels of these compounds when smoked by consumers . . . ."  The plaintiffs have not advanced this theory on appeal, however, so we do not consider it.

[4]In addition to their claim under the Maine Unfair Trade Practices Act, the plaintiffs' amended complaint also asserts a second count for unjust enrichment.  Because neither side argues that the two claims require different preemption analyses, we do not separately discuss the unjust enrichment count.

seek to certify a class of all purchasers of Marlboro Lights or Cambridge Lights in Maine through November 2002.

In response to the plaintiffs' amended complaint, Philip Morris promptly moved for summary judgment. Philip Morris argued that the plaintiffs' claims were (1) expressly preempted by the FCLAA, (2) implicitly preempted by "the efforts of Congress and the [Federal Trade Commission] for 40 years to implement a national, uniform policy of informing the public about the health risks of smoking," and (3) for similar reasons, not cognizable under the Maine Unfair Trade Practices Act, which does not apply to "[t]ransactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under the statutory authority of the . . . United States." Me. Rev. Stat. Ann. tit. 5, § 208(1).

Each of these arguments relied to some degree on what Philip Morris described as "the FTC's comprehensive, nationwide program regulating the disclosure of tar and nicotine yields." In 1959, the then-seven major American cigarette manufacturers had agreed to delete all tar and nicotine claims from their advertising. The FTC subsequently advised them, however, "that a factual statement of the tar and nicotine content (expressed in milligrams) of the mainstream smoke from a cigarette would not be in violation . . . of any of the provisions of law administered by [the FTC]," provided the statement was "supported by adequate

records of tests conducted in accordance with the Cambridge Filter Method." Press Release, Fed. Trade Comm'n (Mar. 25, 1966). But this advice did not extend to "collateral representations (other than factual statements of tar and nicotine contents of cigarettes offered for sale to the public) . . . expressly or by implication, as to reduction or elimination of health hazards." Id.

Then, in 1967, the FTC itself began using the Cambridge Filter Method to test, inter alia, all cigarette "brands for which any tar or nicotine statement appears on the label or in the advertising . . . to determine the accuracy of such statement." 32 Fed. Reg. 11,178 (Aug. 1, 1967). Though the FTC understood at the time that this method could not "determine the amount of tar and nicotine inhaled by any human smoker," it was nevertheless adopted to produce results "based on a reasonable standardized method" which were "capable of being presented to the public in a manner that is readily understandable." Press Release, Fed. Trade Comm'n, FTC to Begin Cigarette Testing (Aug. 1, 1967). The FTC agreed to report the test results to Congress periodically in order to ensure their dissemination to the smoking public, and made the first such report in late 1967.

The FTC subsequently proposed a rule requiring cigarette manufacturers "to disclose, clearly and prominently, in all advertising[,] the tar and nicotine content of the advertised variety . . . based on the most recently published [FTC] test

results." 35 Fed. Reg. 12,671 (Aug. 8, 1970). But the rulemaking process was suspended when a consortium of cigarette manufacturers, including Philip Morris, reached an agreement with the FTC on a "voluntary program" to like effect. Letter from Horace R. Kornegay, President, The Tobacco Institute, Inc., to Fed. Trade Comm'n (Dec. 17, 1970). By agreeing to the program, however, the manufacturers did not "admit that the failure affirmatively to disclose" the test results in their advertising "constitutes a violation of law," or even that the FTC had the authority to enact the proposed rule. Id. The FTC, for its part, took the position that it "retained the unconditional right to reschedule the . . . Rule proceeding and to take any other action relating to this subject at any time . . . ." 36 Fed. Reg. 784 (Jan. 16, 1971).

Since then, the FTC has neither resumed the rulemaking proceedings suspended by its agreement with the cigarette manufacturers, nor promulgated any formal rule requiring them to disclose the tar or nicotine content of their products. In 1987, the FTC stopped conducting its own tests of cigarettes. The testing continued, however, under the auspices of the Tobacco Institute Testing Laboratory, operated by the major American cigarette manufacturers.[5] The manufacturers agreed to allow the

---

[5]Most of these manufacturers belonged to the Tobacco Institute, an industry group that was disbanded in 1999 pursuant to the master settlement agreement between a number of states and cigarette companies. The testing has since continued at the Tobacco Industry Testing Laboratory, a similar facility.

FTC to monitor the lab's procedures, which included the use of the Cambridge Filter Method. The FTC has obtained the test results from the individual manufacturers through its compulsory process authority, see 15 U.S.C. § 46(b), and reported those results to Congress for each year through 1998.[6]

Based on this regime, Philip Morris characterized the lawsuit as "a challenge to the FTC's regulatory scheme," because "terms like 'light' and 'lowered tar' . . . convey precisely the same comparative information" as the tar and nicotine measurements derived from testing under the Cambridge Filter Method. The district court agreed, reasoning that

> To respond to Plaintiffs' claims, Philip Morris would have to tell the public that the FTC Method test, though accurate in the laboratory, was inaccurate in real life, and that light cigarette smokers . . . infused greater amounts of nicotine and tar than the designation 'Lights' and 'Lowered Tar and Nicotine' would imply. But, this information, if conveyed through a form of advertising, would run head first into . . . the comprehensive federal scheme governing the advertising and promotion of cigarettes.

436 F. Supp. 2d at 152 (internal quotation marks omitted). Finding the plaintiffs' claims thus "grounded on Philip Morris's 'advertising or promotion of . . . cigarettes labeled in conformity

---

[6]The FTC continued to collect the test results, at least through 2002, but has stopped reporting them, for reasons that are unclear from the record. The FTC has, however, made the results for the years 1999 through 2002 available in response to requests under the Freedom of Information Act, 5 U.S.C. § 552 (2007). Fed. Trade Comm'n, Cigarette Tar, Nicotine and Carbon Monoxide Yields Produced by Cigarette Manufacturers for the Years 1999-2002, available at http://www.ftc.gov/foia/frequentrequest.shtm.

with the provisions of' federal law and regulation," the district court concluded that they were expressly preempted by the FCLAA. Id. at 153 (quoting 15 U.S.C. § 1334(b)). The court did not decide Philip Morris's alternative arguments for summary judgment.[7] Id. at 133 n.1. This appeal followed.

**II.**

The plaintiffs challenge the ruling below as at odds with Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992), where a plurality of the Supreme Court held that some--but not all--actions for damages under state law are expressly preempted by the FCLAA. Id. at 523-24. In response, Philip Morris argues that the district court correctly found the plaintiffs' claims preempted under Cipollone. Philip Morris simultaneously urges us to affirm the entry of summary judgment in its favor on the alternative grounds not reached below, namely, that the plaintiffs' claims are implicitly preempted by federal law or that they complain of "actions otherwise permitted under laws" and therefore cannot serve as the basis for liability under the Maine Unfair Trade Practices Act. We review these arguments de novo. See Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 (1st Cir. 1997).

---

[7]Each side also asked the district court to strike certain evidentiary materials or statements of fact submitted in connection with the motion for summary judgment. Some of these requests were denied and some were granted, but none of the district court's rulings in this regard have been questioned on appeal.

-9-

**A.**

"A fundamental tenet of our federalist system is that constitutionally enacted federal law is supreme to state law.  As a result, federal law sometimes preempts state law either expressly or by implication."  N.H. Motor Transport Ass'n v. Rowe, 448 F.3d 66, 74 (1st Cir. 2006) (citation omitted), cert. granted, 127 S. Ct. 3037 (2007).  Preemption questions ultimately turn on congressional intent, e.g., Cipollone, 505 U.S. at 516, and the primary indicator of that intent is the text of the congressional act claimed to have preemptive effect, e.g., Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246, 252 (2004).  But "[t]he text of the preemption provision must be viewed in context, with proper attention paid to the history, structure, and purpose of the legislative scheme in which it appears."  Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 591 (2001).

**1.**

As noted at the outset, the FCLAA's preemption clause states that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."  15 U.S.C. § 1334(b).  Those provisions mandate that the packages of all cigarettes sold in the United States--and, in general, their advertisements--bear one of a rotating series of labels warning

about the adverse health effects of smoking.[8]  Id. §§ 1333(a), (c).
But no additional "statement relating to smoking and health . . .
shall be required on any cigarette package."  Id. § 1334(a).  The
FCLAA also bans cigarette advertising "on any medium of electronic
communication subject to the jurisdiction of the Federal
Communications Commission," id. § 1335, and preserves the authority
of the FTC over "unfair or deceptive acts or practices in the
advertising of cigarettes," id. § 1336.

These provisions were added to the FCLAA through the
Public Health Cigarette Smoking Act of 1969, Pub. L. 91-222, 84
Stat. 87-90, enacted as the restrictions on cigarette advertising
contained in the prior version of the FCLAA were set to expire.
Pub. L. 89-92 § 10, 79 Stat. 282, 285 (1965).  As the expiration
date approached, both federal and state authorities prepared to
resume their efforts to regulate cigarette advertising.  See
Cipollone, 505 U.S. at 514-15.  Thus, Congress amended the FCLAA

> to establish a comprehensive Federal program to deal with
> cigarette labeling and advertising with respect to any
> relationship between smoking and health, whereby--
>
> (1) the public may be adequately informed about any
> adverse health effects of cigarette smoking by inclusion of
> warning notices on each package of cigarettes and in each
> advertisement of cigarettes; and
>
> (2) commerce and the national economy may be (A)
> protected to the maximum extent consistent with this declared

---

[8]These labels are the now-familiar "Surgeon General's Warning"
statements, e.g., "Smoking Causes Lung Cancer, Heart Disease,
Emphysema, and May Complicate Pregnancy."

-11-

policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

15 U.S.C. § 1331.

With these purposes in mind, the Cipollone Court considered whether the FCLAA's preemption clause barred a state-law suit for damages brought by a smoker who had allegedly developed lung cancer from the defendants' cigarettes. 505 U.S. at 509-10. The smoker asserted a number of common law causes of action, including strict liability, negligent failure to warn, breach of express warranty, fraudulent misrepresentation, and civil conspiracy. Id. The court of appeals held that, while § 1334(b) did not expressly preempt common law claims, the FCLAA's labeling requirement "revealed a congressional intent to exert exclusive federal control over every aspect of the relationship between cigarettes and health." Id. at 517. Accordingly, the court of appeals ruled that the plaintiff's claims "challenging the adequacy of the warnings on labels or in advertising or the propriety of [the defendants'] advertising and promotional activities" were implicitly preempted. Id.

A plurality of the Court disagreed with this analysis, holding that "the pre-emptive scope of the [FCLAA] is governed entirely by the express language in [§ 1334(b)]," id., which did, in fact, reach some common law actions. Id. at 521-23. But because "[f]or purposes of [§ 1334(b)], the common law is not of a

piece," the plurality explained that it had to "look to each of [the smoker's] common-law claims to determine whether it is in fact pre-empted." Id. at 523 (footnote omitted). This approach required the plurality to

> ask whether the legal duty that is the predicate of the common-law damages action constitutes a "requirement or prohibition based on smoking or health . . . imposed under State law with respect to advertising or promotion, giving that clause a fair but narrow reading . . . . [E]ach phrase within that clause limits the universe of common-law claims pre-empted by the statute.

Id. at 524 (quoting 15 U.S.C. § 1334(b)). Employing this analysis, the plurality determined that the FCLAA preempted the claim, pleaded as a failure to warn, that the defendants' "advertising and promotions should have included additional, or more clearly stated warnings," because it relied on "a state-law 'requirement or prohibition . . . with respect to . . . advertising or promotion.'" Id. (quoting 15 U.S.C. § 1334(b)).

The plurality proceeded to consider the smoker's two theories of fraudulent misrepresentation. The first, that the defendants, "through their advertising, neutralized the effect of federally mandated warning labels," was preempted by the FCLAA. Id. at 527. As the plurality explained, this theory was "predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards of smoking," which is itself "merely the converse of a state-law requirement that warnings be included in [such]

-13-

materials." Id. This fraudulent misrepresentation claim, then, was "inextricably related to" the failure-to-warn claim and therefore also premised on a "requirement or prohibition based on smoking and health" imposed by state law. Id. at 528.

But the plurality reached a different conclusion as to the smoker's second fraudulent misrepresentation theory: "intentional fraud and false misrepresentation both by false misrepresentation of a material fact and by concealment of a material fact." Id. (internal quotation marks and bracketing omitted). First, the plurality held that the FCLAA does not preempt fraudulent concealment claims that "rely on a state-law duty to disclose such facts through channels of communication other than advertising or promotion," e.g., in the case of a state law requiring cigarette manufacturers "to disclose material facts about smoking and health to an administrative agency." Id. Second, the plurality held that

> fraudulent-misrepresentation claims that do arise with respect to advertising and promotion (most notably claims based on allegedly false statements of material fact made in advertisements) are not pre-empted by [§ 1334(b)]. Such claims are predicated not on a duty "based on smoking and health" but rather on a more general obligation--the duty not to deceive.

Id. at 528-29. The plurality saw this result as consistent with the text, structure, and purpose of the FCLAA. Id. at 529. First, the FCLAA "offered no sign that [Congress] wished to insulate manufacturers from longstanding rules governing fraud"--in fact,

the Act "explicitly reserved the FTC's authority to identify and punish deceptive advertising practices . . . ." Id. Second, reading § 1334(b) to exclude fraud claims would not frustrate the FCLAA's stated goal of protecting commerce from "diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health," 15 U.S.C. § 1331(2), because "state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity."  505 U.S. at 529.

This analysis of the FCLAA's effect on the smoker's claims held sway with only four of the Court's nine Justices.  Two others joined Justice Blackmun's opinion that the FCLAA did not preempt any common law claims for damages, id. at 531, while another joined Justice Scalia's opinion that § 1334(b) preempted all of the smoker's common law theories.  Id. at 548.  Most lower courts have nevertheless treated the plurality opinion as controlling, see Brown v. Brown & Williamson Tobacco Corp., 479 F.3d 383, 389 (5th Cir. 2007) (collecting cases), as have the parties here, both on appeal and in the district court, 436 F. Supp. 2d at 142.  We therefore do the same.[9]  Cf. Harshbarger, 122 F.3d at 69-77 (reconciling opinions of plurality and Justice Scalia

_____

[9]From this point on, then, we will refer to the plurality opinion as simply "Cipollone," except when necessary to contrast the views of the dissenting opinion with those of the plurality.

-15-

in Cipollone insofar as possible but following the plurality opinion in case of disagreement between them).

**2.**

The parties agree that whether the FCLAA expressly preempts the plaintiffs' claims depends on how best to categorize them by analogy to the various causes of action considered in Cipollone. In doing so, as the district court recognized, 436 F. Supp. 2d at 151, we must look beyond the plaintiffs' own classification of their claims and to their actual substance. See Kirksey v. R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1043 (7th Cir. 1999); accord Danca v. Private Health Care Sys., Inc., 185 F.3d 1, 5 (1st Cir. 1999) (endorsing the same approach in deciding whether ERISA preempts particular state-law claims).

The plaintiffs seek relief under the Maine Unfair Trade Practices Act, which, in relevant part, outlaws "unfair or deceptive acts or practices in the conduct of any trade or commerce." Me. Rev. Stat. Ann. tit. 5, § 207. Though this prohibition encompasses various kinds of behavior, including "a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances," Maine v. Weinschenk, 868 A.2d 200, 206 (Me. 2005), the substance of the plaintiffs' claim is that Philip Morris has falsely represented certain of its brands as "light" or having "lower tar and nicotine" although they deliver the same quantities of these ingredients to

a smoker as do "full-flavored" cigarettes. So, under the functional approach, we consider how this particular theory--as opposed to a more generalized claim under the Maine Unfair Trade Practices Act--resembles the various common-law causes of action considered in Cippolone. If, as the plaintiffs argue, they have indeed alleged fraudulent misrepresentation claims, the claims are not preempted because, as Cipollone explains, they are not premised on a state-law duty based on smoking and health. But if, as Philip Morris argues, the plaintiffs have in reality alleged failure-to-warn or warning neutralization claims, the claims are preempted.

While the district court stopped short of assigning a specific label to the plaintiffs' claims, its reasoning suggests that it considered them analogous to the failure-to-warn theory held preempted by Cipollone. The court opined that the plaintiffs had failed in their "valiant attempt to tailor their claims to fit within the Cipollone exception for violations of the duty not to deceive . . . ." 436 F. Supp. 2d at 151. Instead, the district court identified "the gist of the Plaintiffs' cause of action" as dependent on "what Philip Morris actually said about Lights and what the Plaintiffs claim [it] should have said." Id. (emphasis added). And what Philip Morris "should have said," the court understood the plaintiffs to assert, was that Marlboro Lights and Cambridge Lights deliver more tar and nicotine to an actual smoker than "the designation 'Lights' and 'Lowered Tar and Nicotine' would

-17-

imply." Id. at 152. Because doing so would require Philip Morris to alter its advertising or promotion of its cigarettes, the district court concluded, the plaintiffs' claims were expressly preempted by the FCLAA as construed by Cipollone.

We differ with the district court's view of the fit between the plaintiffs' theory and the Cipollone taxonomy and, more fundamentally, of Cipollone itself. To start, we do not read Cipollone to hold that the FCLAA preempts claims "grounded on [a defendant's] 'advertising or promotion of . . . cigarettes labeled in conformity with the provisions of' federal law and regulation," as the district court ultimately explained its conclusion. 436 F. Supp. 2d at 153 (quoting 15 U.S.C. § 1334(b)). Cipollone reasoned that "each phrase" in § 1334(b)--not just the phrase "with respect to the advertising or promotion of any cigarettes"--"limits the universe of common-law claims pre-empted by the statute." 505 U.S. at 524. So "[t]he appropriate inquiry is not whether a claim challenges the 'propriety' of advertising and promotion, but whether the claim would require the imposition under state law of a requirement or prohibition based on smoking and health with respect to advertising and promotion." Id. at 525. A claim is not preempted, then, merely because it is "grounded on" the advertising or promotion of cigarettes with FCLAA-compliant labels.

Nor is a claim preempted merely because it arises out of the adverse health consequences of such cigarettes, as both the

-18-

reasoning and the result in Cipollone make clear. There, in fact, all of the plaintiff's claims were "based on smoking and health" in the sense that they "alleged that [she] developed lung cancer because she smoked cigarettes," 505 U.S. at 509, yet the Court held that the FCLAA preempted only some of them.[10] And the fate of each claim depended on "whether the legal duty that is the predicate of the common-law damages action"--not the claim itself--met the criteria of § 1334(b). Id. at 524. Thus, for example, while the theory that the defendants in Cipollone "had expressly warranted that smoking the cigarettes which they manufactured and sold did not present any significant health consequences," id. at 509 (internal quotation marks omitted), was clearly based on smoking and health, it was not preempted because "it [did] not rest on a duty imposed under state law," but on the defendants' own "contractual commitment voluntarily undertaken," i.e., the warranty. Id. at 526. Accordingly, the FCLAA preempts only those claims based on a "requirement or prohibition based on smoking and health under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in accordance

---

[10]In doing so, the Court also overturned the ruling of the court of appeals that the FCLAA, which "revealed a congressional intent to exert exclusive federal control over every aspect of the relationship between cigarettes and health," preempted all of the smoker's claims. 505 U.S. at 517.

with" the FCLAA.  15 U.S.C. § 1334(b) (emphasis added).  It does not preempt claims because they are "based on smoking and health."[11]

Furthermore, unlike Philip Morris, we do not read the Court's subsequent decision in Reilly to suggest that the statute's preemptive effect on a claim depends on the claim's connection with "smoking and health."  In Reilly, the Court held that § 1334(b) preempted regulations on tobacco advertising promulgated by the Massachusetts Attorney General pursuant to his authority under that state's counterpart to the Maine Unfair Trade Practices Act, Mass. Gen. Laws ch. 93A.  533 U.S. at 533.  Though their stated purpose was "to address the incidence of cigarette smoking . . . by children under legal age," id. (internal quotation marks omitted), the Court rejected the notion that the regulations were "not 'based on smoking and health' because they do not involve health-related content in cigarette advertising but instead target youth exposure

---

[11]Indeed, this was one of the primary points of disagreement between the Cipollone plurality and Justice Scalia, who argued in dissent that questions of FCLAA preemption "must focus not upon the ultimate source of the duty (e.g., the common law) but upon its proximate application."  505 U.S. at 553.  This "'proximate application' methodology for determining whether [claims] invoke duties 'based on smoking and health' . . . would ask . . . whether, whatever the source of the duty, it imposes an obligation in this case because of the effect of smoking upon health."  Id. at 554 (emphasis added).  While conceding the "theoretical attraction" of this argument, the plurality rejected it as at odds with "a fair understanding of [the] congressional purpose" behind the FCLAA. Id. at 529 n.27.  This exchange further solidifies our view that the FCLAA preempts claims predicated on a state-law duty, with respect to advertising and promotion, which is itself based on smoking and health--not "claims based on smoking and health."

to cigarette advertising." Id. at 547. Noting that the FCLAA "prohibited state cigarette advertising regulations motivated by concerns about smoking and health," the Court reasoned that "[a]t bottom, the concern about youth cigarette advertising is intertwined with" such concerns, bringing the regulations within the preemptive sweep of the FCLAA. Id. at 548.

Philip Morris urges us to draw an analogy between the regulations found preempted in Reilly and the claims of the plaintiffs here, arguing that, in either case, a state consumer protection act is used "to create requirements or prohibitions regarding advertisements and promotions that are intertwined with the concern about cigarette smoking and health" (internal quotation marks omitted). But this argument again confuses the claim at hand with its predicate state-law duty as the relevant "requirement or prohibition" under § 1334(b). The plaintiffs' claims are indeed "intertwined with the concern about cigarette smoking and health," just as surely as the regulations in Reilly were; the difference, however, is that those regulations were themselves the "prohibitions," while the prohibition here is the ban on "unfair or deceptive acts or practices in the conduct of any trade or commerce" under the Maine Unfair Trade Practices Act. And Cipollone, as we have noted, treats a state-law "duty not to deceive" as broader than a "duty 'based on smoking and health'" and

-21-

therefore beyond the reach of FCLAA preemption.  505 U.S. at 529-30 (quoting 15 U.S.C. § 1334(b)).

We see nothing in Reilly suggesting any intent to disturb this aspect of the Cipollone plurality holding.[12]  Nor do we see any internal inconsistency in the view that the phrase "based on smoking and health" includes state-law prohibitions on cigarette ads targeting youths, Reilly, 533 U.S. at 448, but excludes state prohibitions on cigarette ads making false statements of material fact, Cippolone, 505 U.S. at 524.  Accordingly, we agree with those courts that have rejected the notion that the FCLAA preempts claims "intertwined with the concern about smoking and health" but nevertheless premised on a state-law duty that is broader in scope. See Mulford v. Altria Group, Inc., No. 05-659, 2007 WL 1969734, at *18 (D.N.M. Mar. 16, 2007); Gerrity v. R.J. Reynolds Tobacco Co., 399 F. Supp. 2d 87, 95 (D. Conn. 2005).[13]

_____

[12]Indeed, Reilly notes that "Members of this Court have debated the precise meaning of 'based on smoking and health,'" citing to the footnote in Cipollone--referenced here at note 11, supra--where the plurality rejects the views of the concurring and dissenting opinions on that point.  546 U.S. at 547.  But Reilly does not purport to resolve the debate and, aside from its holding that the phrase embraces regulations directed at youth exposure to cigarette advertising, does not explore the issue any further.  See id.

[13]Philip Morris relies on a recent decision of the California Supreme Court, In re Tobacco Cases II, ___ Cal. Rptr. 3d ___, No. S129522, 2007 WL 2199006 (Cal. Aug. 2, 2007), for the proposition that "If the theory is based on smoking and health, the claim is preempted."  Though the decision arguably contains some language to that effect, its holding is simply that § 1334(b) preempts the claim that Philip Morris violated California's unfair competition law by targeting minors with its advertising--a holding, as the

Because the state-law "duty not to deceive" is one such "more general obligation," it falls within Cipollone's express holding that "claims based on allegedly false statements of material fact made in advertisements" survive FCLAA preemption. 505 U.S. at 528-29. In line with this holding, courts have routinely (though not uniformly) concluded that the FCLAA does not preempt fraudulent misrepresentation claims arising out of false statements made in advertising or promoting cigarettes. See, e.g., Spain v. Brown & Williamson Tobacco Co., 363 F.3d 1183, 1202 (11th Cir. 2004); Mulford, 2007 WL 1969734, at *16; Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc., 178 F. Supp. 2d 198, 216 & 264-65 (E.D.N.Y. 2000), aff'd in relevant part, 344 F.3d 211, 222 (2d Cir. 2003); Johnson v. Brown & Williamson Tobacco Corp., 122 F. Supp. 2d 194, 203 (D. Mass. 2000); Izzarelli v. R.J. Reynolds Tobacco Co., 117 F. Supp. 2d 167, 175 (D. Conn. 2000); Hyde v. Philip Morris, Inc., No. 97-0359, 1998 WL 656074, at *6 (D.R.I. May 1, 1998); Whiteley v. Philip Morris Inc., 11 Cal. Rptr. 3d 807, 842 (Cal. Ct. App. 2004); Price v. Philip Morris, Inc., 848

court noted, that was ordained by Reilly. Id. at *9. Again, we do not perceive any tension between this result and our understanding of Cipollone. Indeed, the California Supreme Court observed that the FCLAA would not preempt a state unfair competition claim "that sought to impose only content-neutral restrictions on cigarette advertising--such as a requirement that the advertising not contain false statements of fact--that were unrelated to smoking and health." Id. In re Tobacco Cases II, then, ultimately does not support Philip Morris's position. And to the extent that the case might arguably be read more broadly, we respectfully disagree with it for the reasons set forth at length in the text of this opinion.

N.E.2d 1, 33 (Ill. 2005); Small v. Lorillard Tobacco Co., 679 N.Y.S.2d 593, 603-604 (N.Y. App. Div. 1998); Est. of Schwarz v. Philip Morris Inc., 135 P.3d 409, 421 (Or. Ct. App. 2006) (en banc); but see In re Tobacco Cases II, No. JCCP 4042, 2004 WL 2445337, at *19-*22 (Cal. Super. Ct. Aug. 4, 2004), aff'd sub nom. In re Tobacco II Cases, 47 Cal. Rptr. 3d 917 (Cal. Ct. App.), rev. granted, 146 P.3d 1250 (Cal. 2006)[14]; Dahl v. R.J. Reynolds Tobacco Co., No. 03-5582, 2005 WL 1172019, at *10-*12 (Minn. Dist. Ct. May 11, 2005); Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 440 (Tex. 1997). A number of these decisions, in fact, hold that the FCLAA does not preempt the very theory the plaintiffs advance here--that a cigarette manufacturer has perpetrated fraud by stating that its light brand offers lower tar and nicotine than its full-flavored one. See Mulford, 2007 WL 1969734, at *19; Price, 848 N.E.2d at 33; Est. of Schwarz, 135 P.3d at 421; but see Brown, 479 F.3d at 391-93; Clinton v. Brown & Williamson Tobacco Co., ___ F. Supp. 2d ___, No. 05 Civ. 9907, 2007 WL 2181896, at *11 (S.D.N.Y. July 23, 2007); In re Tobacco Cases II, 2004 WL 2445337, at *19-*21; Dahl, 2005 WL 117290, at *11.

The district court saw the plaintiffs' case differently, observing that "[o]ther than these descriptors" (i.e., the "light" and "lower tar and nicotine" claims) "the record here is devoid of

---

[14]We note that these proceedings--which we henceforth refer to as "In re Tobacco Cases II"--are not the same as the In re Tobacco Cases II discussed in note 13, supra.

-24-

any _affirmative_ misstatement."  436 F. Supp. 2d at 152 (footnote omitted).  Based on this reasoning, Philip Morris argues that the district court properly treated the plaintiffs' claims as "based on _implied_ misrepresentations about health," which qualify as preempted failure-to-warn or warning neutralization claims, rather than non-preempted fraudulent misrepresentation claims, which arise out of only "express" misrepresentations.  We disagree.

First, we question the conclusion that, although the descriptors are themselves characterized as affirmative misstatements, they cannot ground a fraudulent misrepresentation claim left unscathed by _Cipollone_'s reading of the FCLAA.  The district court appears to have based its conclusion on its understanding that, despite the popularity of the terms "light" and "lower tar and nicotine" in cigarette advertising, "Congress and the FTC never acted to restrict the tobacco companies from using these general descriptors."  436 F. Supp. 2d at 152; _see also Clinton_, slip op. at 22 (finding fraudulent misrepresentation claim arising out of descriptors expressly preempted because "the FTC has declined to _disallow_ those terms despite several invitations to do so").  But whatever support this might lend to an argument for _implied_ preemption of state law--and we consider that question in detail _infra_--it provides little guidance in applying the _express_ preemption provision of the FCLAA, the scope of which "is governed

-25-

entirely by the express language in" § 1334(b).[15] _Cipollone_, 505 U.S. at 517. _Cipollone_ read this language to preserve state-law claims based on allegedly fraudulent statements in advertising and promotion, without regard to whether Congress or the FTC had separately acted to prohibit particular examples of them.

_Cipollone_ arrived at this interpretation in part because, in the FCLAA, "Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud." _Id._ at 529. So if its inaction since has any significance--and we usually hesitate to make much ado about congressional nothing, _see_, _e.g._, _Estey_ v. _Comm'r, Me. Dep't of Human Servs._, 21 F.3d 1198, 1206 (1st Cir. 1994)--it could just as likely be that Congress chose not to regulate the descriptors because it believed the generalized state-law prohibitions on fraud left in place under the FCLAA adequately protected smokers against false claims to lower tar and nicotine, and not because it viewed such claims as permissible. But, in either case, what Congress thinks of "light" and "lower tar and nicotine" advertisements in general simply does not speak to whether, in enacting the FCLAA, Congress intended to preempt state lawsuits challenging them. The answer to that question, as _Cipollone_ makes clear, lies in § 1334(b).

---

[15]Philip Morris questions the vitality of this holding in light of subsequent Supreme Court cases on the preemptive effect of other federal statutory provisions. In Part II.B, _infra_, we consider, and reject, this argument.

-26-

Second, Cipollone does not appear to treat claims based on "implied" as opposed to "express" misrepresentations differently for purposes of FCLAA preemption. Under general principles of tort law, either an express or an implied statement can give rise to a claim for fraudulent misrepresentation. See Restatement (Second) of Torts § 526(c) (1977); accord Est. of Whitlock, 615 A.2d 1173, 1176 (Me. 1992). And Cipollone flatly holds that "fraudulent-misrepresentation claims that do arise with respect to advertising and promotion (most notably claims based on allegedly false statements of material fact made in advertisements)" are not preempted, without drawing any distinction between the express and the implied. 505 U.S. at 528-29. Indeed, in either case, the claim is "predicated not on a duty 'based on smoking and health' but on a more general obligation--the duty not to deceive." Id. The "express" or "implied" nature of an allegedly fraudulent misrepresentation, then, does not determine whether it is preempted by the FCLAA under the Cipollone approach. See Mulford, 2007 WL 1969734, at *17 (rejecting distinction, for purposes of FCLAA preemption, between fraud claim arising out of statements "light" and "Lowered Tar and Nicotine," and statement "Smoking cures cancer," which Philip Morris had proffered as a counterexample of "express," as opposed to "implied," misrepresentation).

Cipollone does set up a dichotomy between fraud "by false representation of a material fact," on one hand, and "by

-27-

concealment of a material fact," on the other.  505 U.S. at 528 (internal quotation marks and bracketing omitted).  As just discussed, the FCLAA does not preempt claims of the former; Cipollone holds that claims for the latter also survive preemption "insofar as those claims rely on a state-law duty to disclose such facts through channels of communication other than advertising or promotion," such as, for example, a state-law duty "to disclose such facts to an administrative agency." Id. We need not concern ourselves with Cipollone's holding on the reach of § 1334(b) over fraudulent concealment claims, however, because the plaintiffs have not brought any.[16]  Instead, they allege that Philip Morris made material statements of fact that it knew to be false--"that Marlboro Lights and Cambridge Lights cigarettes are 'light' or have 'lower tar and nicotine'"--to encourage smokers to purchase its products, and that smokers did so in reliance on those statements. These allegations state a claim for fraudulent misrepresentation. See Restatement (Second) of Torts § 525 (1977); accord, e.g., St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y., 818 A.2d 995, 1003-04 (Me. 2003).  Unlike the district court, then, we

---

[16]While the amended complaint includes allegations of fraudulent concealment, we read them to assert a basis for tolling the statute of limitations on the plaintiffs' claims for relief, not a theory of recovery in their own right.  Philip Morris does not argue that, to the extent § 1334(b) preempts fraudulent concealment claims, it also forecloses the use of that doctrine to toll the limitations period on a state-law claim that is otherwise not preempted, so we do not consider any such argument.

-28-

do not see the plaintiffs' claims as arising out of what Philip Morris "should have said," but rather, what it did in fact say: that Marlboro Lights and Cambridge Lights have "lower tar and nicotine" than their full-flavored counterparts.

Philip Morris nevertheless insists that this theory amounts to a preempted failure-to-warn claim, "[b]ecause any false impression that the descriptors allegedly created would have been eliminated if [Philip Morris] had provided additional health information regarding compensation," that is, a smoker's tendency to take in the same harmful quantities of tar and nicotine from light cigarettes as from regular ones. We accept, for present purposes, that the plaintiffs could not claim to have been defrauded by the statements "light" and "lower tar and nicotine" in Philip Morris's advertising and promotion if they were accompanied by a specific warning about compensation. And we agree that, if the plaintiffs were claiming that the failure to give such a warning through those media was a breach of Philip Morris's duty under Maine law, the FCLAA would preempt that claim as "rely[ing] on a state-law requirement or prohibition with respect to advertising or promotion." Cipollone, 505 U.S. at 524 (internal quotation marks and ellipses omitted). But that is not the plaintiffs' claim. Again, they allege that Philip Morris made fraudulent misrepresentations in derogation of "a more general obligation--the duty not to deceive." Id. at 528-29.

The fact that these alleged misrepresentations were unaccompanied by additional statements in the nature of a warning does not transform the claimed fraud into failure to warn. Indeed, we have trouble imagining any misrepresentation claim wholly independent of what else the defendant said or did not say, given the "well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 364 (3d Cir. 1993) (adopting "bespeaks caution" doctrine in federal securities fraud context); accord, e.g., Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 16-17 (1st Cir. 2004) (considering effect of disclaimer on plaintiff's ability to show reasonable reliance on false statement). Accepting Philip Morris's argument, then, would extend the preemptive reach of the FCLAA to virtually all fraudulent misrepresentation claims, doing violence to Cipollone's explicit holding that those claims survive preemption.[17]

---

[17]While Justice Scalia agreed with the plurality's conclusion that § 1334(b) preempts failure-to-warn claims unless they are based on a duty to make disclosures outside of advertising or promotion, he disagreed with the implication that the FCLAA's preemptive effect extends to state laws only insofar as they specify that warnings be provided through advertising or promotion. 505 U.S. at 554-55. Instead, Justice Scalia posited that "[t]he test for pre-emption in this setting should be one of practical compulsion, i.e., whether the law practically compels the manufacturers to engage in behavior that Congress has barred the States from prescribing directly." Id. at 555. Under this test, § 1334(b) would preempt state law that "requires manufacturers to advise consumers of their products' dangers, but . . . is indifferent to how that requirement is met,"

Moreover, Cipollone itself conceived of failure-to-warn claims much more narrowly than Philip Morris does, describing them to "require a showing that . . . advertising or promotions should have included additional, or more clearly stated warnings." Id. 524 (emphasis added). Because the plaintiffs' chosen theory of recovery requires no such showing, theirs is not a preempted failure-to-warn claim, as a number of courts have concluded in rejecting similar arguments. See Mulford, 2007 WL 1969734, at *17; Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1294-95 (E.D.N.Y. 2006), pet. for rev. of class certification granted sub nom. McLaughlin v. Philip Morris USA, Inc., No. 06-4666 (2d Cir. Nov. 16, 2006); Izzarelli, 117 F. Supp. 2d at 175; Price, 848 N.E.2d at 33; Est. of Schwarz, 135 P.3d at 421.

For the same reason, we do not see the plaintiffs' claims as embracing a preempted warning neutralization theory. Warning

because, as a practical matter, such a law will compel tobacco companies to include those warnings in its advertisements or promotions. Id. at 554-55. Courts that have treated fraud claims arising out of the statements "light" and "lower tar and nicotine" as failure-to-warn claims--including the district court here--tend to rely on a form of Justice Scalia's "practical compulsion" test. See, e.g., 436 F. Supp. 2d at 152 (reasoning that any warning about compensation, "if conveyed through a form of advertising, would run head first into what Reilly describes as the comprehensive federal scheme governing the advertising and promotion of cigarettes") (internal quotation marks omitted); see also Brown, 489 F.3d at 392-93; In re Tobacco Cases II, 2004 WL 2445337, at *21; Dahl, 2005 WL 1172019, at *11. But because the Cipollone plurality did not adopt Justice Scalia's method of analyzing failure-to-warn claims, 505 U.S. at 524-25, that a lawsuit might compel a manufacturer to alter its advertising does not mean the suit is preempted by the FCLAA.

neutralization is a species of products liability claim based on conduct by the manufacturer tending to dilute what might otherwise serve as an effective warning of the dangers of its product. See, e.g., McNeil v. Wyeth, 462 F.3d 364, 368 n.4 (5th Cir. 2006); Hon v. Stroh Brewery Co., 835 F.2d 510, 514-15 (3d Cir. 1987); 2 Louis R. Frumer & Melvin I. Friedman, Products Liability § 12.03[2][e], at 12-61--12-62 (1960 & 2003 supp.). As an example, Cipollone cited "advertising that 'associated cigarette smoking with such positive attributes as contentment, glamour, romance, youth, happiness,'" noting the FTC's 1964 conclusion that "'[t]o avoid giving the false impression that cigarette smoking is innocuous,'" such advertising "'must also disclose the serious risks to life that smoking involves.'" 505 U.S. at 527 (quoting 29 Fed. Reg. 8356 (1964)). In light of this "relationship between prohibitions on advertising that downplays the dangers of smoking and requirements for warnings in advertisements," id., Cipollone considered the plaintiff's warning neutralization claim "inextricably related to [her] failure-to-warn claim" and likewise preempted. Id. at 528.

The plaintiffs here, however, do not allege that the statements "light" and "lower tar and nicotine" diluted the warnings on Philip Morris's packaging or advertising so as to make its cigarettes unreasonably dangerous or otherwise defective. Instead, the plaintiffs allege that the statements deceived them

-32-

into purchasing Marlboro Lights and Cambridge Lights. The presence of the warnings may have some bearing on the materiality of these statements, as just discussed, but that possibility does not change the plaintiffs' case from one about the statements into one about the warnings. As one court has put it, because "[a]ny statement, even affirmatively false misrepresentations about the health effects of smoking, may have some neutralizing effect on the package warning . . . , the concept of neutralization could preempt virtually all affirmative fraud claims" if viewed as expansively as Philip Morris urges. Whiteley, 11 Cal. Rptr. 3d at 837. We, too, reject that expansive view as irreconcilable with the different treatment Cipollone accords warning neutralization claims, on one hand, and fraudulent misrepresentation claims, on the other. See also Mulford, 2007 WL 1969734, at *17; Izzarelli, 177 F. Supp. 2d at 175; Price, 848 N.E.2d at 33; DaSilva v. Am. Tobacco Co., 667 N.Y.S.2d 653, 656 (N.Y. Sup. Ct. 1997); Est. of Schwarz, 135 P.3d at 421.

We acknowledge that the Fifth Circuit came to the opposite conclusion in Brown, ruling that fraudulent misrepresentation claims arising out of the statements "light" and "Lowered Tar and Nicotine" are in effect warning neutralization claims preempted by § 1334(b). 479 F.3d at 392-93; accord In re Tobacco Cases II, 2004 WL 2445337, at *21; Dahl, 2005 WL 1172019, at *7-*8. Taking the plaintiffs there to allege that "the

-33-

descriptors, though accurate under the FTC method, are misleading because they suggest that Lights are less harmful than full-flavored cigarettes," the Brown court reasoned that the FCLAA "pre-empts these 'implied misrepresentation' claims, which arise from statements or imagery in marketing that misleadingly downplay the dangers of smoking, and thus minimize or otherwise neutralize the effect of the federal mandated safety warnings."  479 F.3d at 392 (citing Cipollone, 505 U.S. at 527).

In line with our earlier discussion, however, we do not see anything in Cipollone's discussion of warning neutralization claims that equates them with "implied misrepresentation" claims as Brown does.[18]  We appreciate that the statements "light" and "lower tar and nicotine" could support a warning neutralization claim, i.e., by suggesting that those brands of cigarettes do not pose the same grave threats to health announced in the accompanying warning label.  See, e.g., Maize v. Atl. Ref. Co., 41 A.2d 850, 852 (Pa. 1945) (upholding plaintiff's verdict in products liability suit on the theory that calling cleanser "Safety-Kleen" could cause accompanying warnings to "seem of comparatively minor import").

---

[18]Furthermore, we reiterate our views that Cipollone does not differentiate between "express" and "implied" misrepresentations, and that such a dichotomy is impossible to square with its holding that fraudulent misrepresentation claims escape preemption because they "are predicated not on a duty 'based on smoking and health,' but rather on a more general duty--the duty not to deceive."  505 U.S. at 528-29.  As we have observed, that reasoning applies with the same force regardless of whether a defendant allegedly made false statements of material fact expressly or by implication.

But, as just discussed, it does not follow that those statements cannot also support a different theory of recovery, including one that falls outside the preemptive reach of FCLAA.[19] Indeed, that is the central teaching of Cipollone: the same alleged conduct by a cigarette manufacturer can give rise to a number of claims, some of them preempted and some of them not. 505 U.S. at 523-24. Though, again, plaintiffs cannot dodge § 1334(b) by slapping a non-preempted label on a preempted theory, they otherwise remain free to choose from among these potential claims in framing their complaints. See 5 Frumer & Friedman, supra, § 56.05[3], at 56-75 ("Plaintiffs suing the tobacco companies must, of necessity, assert a broad range of causes of action in order to avoid the pitfalls of preemption"); accord Mulford, 2007 WL 1969734, at *17 (refusing "to convert [a] claim into something that it is not" in deciding whether the FCLAA preempts it).

Of course, plaintiffs who elect to proceed on a non-preempted fraudulent misrepresentation theory must eventually prove each of the elements of that cause of action if they are to prevail, including that the challenged representations are indeed

---

[19]In reaching the opposite conclusion, Brown adopted the reasoning of other courts, including the district court here, that fraud claims arising out of the statements "light" and "lower tar and nicotine" are preempted because the alleged "'deception . . . could easily be corrected by requiring an additional warning on the packages . . . .'" 479 F.3d at 393 (quoting In re Tobacco Cases II, 2004 WL 2445337, at *21). This reasoning tracks Justice Scalia's "practical compulsion" test, which, as we have noted, does not reflect the views of the Cipollone plurality. See note 17, supra.

-35-

false.  But, unlike the court in Brown, we do not believe that a plaintiff's chance of proving his claim plays any role in determining whether it is preempted by the FCLAA.  In rejecting the plaintiffs' characterization of their claim as sounding in fraud, Brown concluded that "[t]he terms 'light' and 'Lowered Tar and Nicotine' cannot . . . be inherently deceptive or untrue," because the cigarettes in question "do deliver less tar and nicotine as measured by the only government-sanctioned methodology for their measurement," i.e., the Cambridge Filter Method.  479 F.3d at 392; see also Clinton, 2007 WL 2181896, at *11.  This reality, in Brown's eyes, foreclosed any fraudulent misrepresentation claim, leaving the plaintiffs to argue that the challenged statements served to neutralize the warnings--a theory preempted by Cipollone's construction of the FCLAA.  497 F.3d at 392.

We think this approach puts the cart before the horse. The assertion that Marlboro Lights and Cambridge Lights rate lower in tar and nicotine than their full-flavored cousins according to the Cambridge Filter Method may ultimately affect whether the plaintiffs can show that the challenged statements are false.  Cf. Schwab, 449 F. Supp. 2d at 1090-91 ("evidence that the FTC approved defendants' representations [as to tar and nicotine content] might tend to disprove the existence of a scheme to defraud").  We do not resolve the issue, however, because Philip Morris did not seek summary judgment on that ground.  Instead, Philip Morris argued

that the plaintiffs' claims--as set forth in their amended complaint--were (1) expressly preempted, (2) implicitly preempted, or (3) exempt from the reach of the Maine Unfair Trade Practices Act. We consider the effect of the descriptors' claimed accuracy on the second and third points infra, but we do not believe that the issue has any relevance in deciding the express preemption question.

Under Cipollone, whether § 1334(b) expressly preempts a particular claim depends on "whether the legal duty that is the predicate of the common-law damages action constitutes a requirement or prohibition based on smoking or health . . . imposed under State law with respect to advertising or promotion," 505 U.S. at 524, not on whether the action itself can ultimately succeed as a matter of substantive law. So we do not see how the statements' falsity--or, for that matter, their materiality, or whether Philip Morris made them with the requisite scienter--bears on the preemption analysis. Such issues "go[] to the merits of the fraud claim, not to the threshold question of preemption." Price, 848 N.E.2d at 36-37; see also Mulford, 2007 WL 1969734, at *17 ("Courts do not determine whether a plaintiff can succeed on the merits of the fraud claim before determining whether the fraud claim itself is preempted."); cf. Glassner v. R.J. Reynolds Tobacco Co., 223 F.3d 343, 349-54 (6th Cir. 2000) (considering whether FCLAA preempted fraud claim before considering whether plaintiff had

-37-

stated elements of fraud cause of action). We disagree, then, with Brown's view that the FCLAA preempts fraud theories arising out of "light" and "lower tar and nicotine" because those statements are not "inherently deceptive or untrue." 479 F.3d at 392.

Finally, Philip Morris argues that, because "the standards for finding liability under consumer protection acts around the country vary widely," allowing the plaintiffs' claims to survive preemption will undermine the FCLAA's goal of protecting manufacturers from "diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 15 U.S.C. § 1331(2). This is not an imaginary concern. As we have explained, however, fraudulent misrepresentation claims, even if brought under the aegis of a state consumer protection act, are not premised on "regulations with respect to any relationship between smoking and health." They are premised on "longstanding rules governing fraud," which themselves arise not from any duty based on smoking and health, but on a duty not to deceive. Cipollone, 505 U.S. at 528-29. So, as Cipollone holds, neither the text of the FCLAA's statement of purpose nor the preemption provision itself fairly evinces the intent to displace all potentially inconsistent state cigarette advertising regulations, only such regulations that are "based on smoking and health." Id.

Of course, <u>Cipollone</u> further reasoned that § 1334(b) does not encompass fraudulent misrepresentation claims because they "rely only on a single, uniform standard: falsity" and therefore "do not create diverse, nonuniform and confusing standards." <u>Id.</u> at 529 (internal quotation marks omitted). Seizing on this language, Philip Morris notes that some of the elements of consumer protection violations, such as reliance and actual damages, vary from state to state. Yet the same can be said of the elements of common-law fraud,[20] <u>see generally</u> Peter A. Alces, <u>The Law of Fraudulent Transactions</u> § 2:3 (1989 & 2006 supp.) (discussing how states differ in articulating the elements of the tort), and <u>Cipollone</u> nevertheless concluded that reading the FCLAA not to preempt such claims was consistent with its text, context, and purpose. 505 U.S. at 528-29. Bound by <u>Cipollone</u>, as the parties agree we are, we reject the argument that the potential for varying standards of liability under different states' consumer protection acts means that the plaintiffs' claims are preempted by the FCLAA. They are not. The district court's ruling was in error.

**B.**

Philip Morris also challenges the plaintiffs' claims as impliedly preempted by federal law. Even in the absence of express

---

[20]In fact, Justice Scalia brought this very point to the plurality's attention, asserting that "it is not true that the States' laws governing fraud and misrepresentation impose identical legal standards." 505 U.S. at 553. The plurality, however, was not swayed. <u>See id.</u> at 529 n.21.

-39-

preemptive language--which the FCLAA contains, but which we have concluded does not reach the claims in this case--federal law can preempt state law by implication in two other ways. See, e.g., California v. ARC Am. Corp., 490 U.S. 93, 100 (1989). First, "Congress implicitly may indicate an intent to occupy an entire field to the exclusion of state law." Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300 (1988). "Second, even if Congress has not occupied the field, state law is nevertheless pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ARC Am. Corp., 490 U.S. at 100-01; see also, e.g., United States v. Locke, 529 U.S. 89, 109-11 (2000). And, whether through field or conflict preemption, "state laws can be pre-empted by federal regulations as well as by federal statutes." Hillsborough County, Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985).

Philip Morris does not argue that either Congress or the FTC has evinced an intent to occupy the entire field of cigarette advertising, or even the narrower field of low-tar cigarette advertising. Nor does Philip Morris protest that complying with both the state law the plaintiffs say has been violated and some contrary federal law would be impossible. Instead, Philip Morris maintains that the "[p]laintiffs' claims conflict with the FTC's

40-year history of regulation and control over the development, testing and marketing of low tar cigarettes, as well as the reporting of tar and nicotine measurements pursuant to the FTC Method and the use of descriptors substantiated by those measurements."  Because Philip Morris has limited its implied preemption argument to the so-called "frustration-of-purpose" theory, see Geier v. Am. Honda Motor Co., 529 U.S. 861, 873-74 (2000) (collecting cases), it cannot prevail unless "the rule of law for which [the plaintiffs] contend [stands] 'as an obstacle to the accomplishment and execution of' the important means-related federal objectives" at stake.  Id. at 881 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

In identifying those objectives, Philip Morris argues that "Congress and the FTC have both sought uniform, national standards for cigarette advertising with respect to smoking and health.  And State-law actions like this one would create a different standard of deceptiveness that would plainly conflict with these goals."  At the outset, we reject the notion that the plaintiffs' claims would interfere with any congressional designs on cigarette advertising.[21]  It is true that, in the FCLAA,

---

[21]Philip Morris claims that these "arguments do not rely on the FCLAA" (emphasis added), but does not identify any other congressional action supporting them.  Looking past this contradiction, we nonetheless consider whether the FCLAA can serve as a source of implied preemption.  And insofar as Philip Morris's implied preemption theory relies on what it perceives as the FTC's desire for uniform national standards of cigarette advertising, as

"Congress prohibited state cigarette advertising regulations motivated by concerns about smoking and health." Reilly, 533 U.S. at 548. By the same token, however, "Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud," which are not so motivated. Cipollone, 505 U.S. at 529. As we have taken pains to elucidate, the plaintiffs' claims seek to enforce state-law prohibitions on fraud, not state-law prohibitions on cigarette advertising based on smoking and health. So their asserted rule of law--that the statements "light" and "lower tar and nicotine" constitute fraud--does not interfere with the goals of the FCLAA, which do not include establishing any national "standard of deceptiveness" for cigarette advertising.

In any event, both the Supreme Court and this one have squarely held that the FCLAA has no preemptive force beyond the language of § 1334(b) itself. Cipollone, as we have noted, overturned the ruling of the court of appeals "that Congress had impliedly pre-empted [the plaintiff's] claims challenging the adequacy of warnings on labels or in advertising or the propriety of [the defendants'] advertising and promotional activities," holding instead that "the pre-emptive scope of the [FCLAA] is governed entirely by the express language in [§ 1334(b)]." 505 U.S. at 517. Relying on Cipollone, we decided in Harshbarger that

---

we explain infra, we do not even think that the FTC itself has enforced a uniform standard in this area.

the FCLAA could not sustain an implied preemption challenge to a Massachusetts law requiring, <u>inter alia</u>, cigarette manufacturers to provide the state health department with nicotine yield ratings for each of their brands "'which shall accurately predict nicotine intake for average consumers.'" 122 F.3d at 62 (quoting Mass. Gen. Laws ch. 94, § 307B (1996)).

In declining to imply a preemptive effect from the FCLAA, <u>Cipollone</u> reasoned that "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation." 505 U.S. at 517 (internal quotation marks and citation omitted). Philip Morris argues that this reasoning has lost its force in light of subsequent Supreme Court decisions teaching that an express "pre-emption provision, by itself, does not foreclose (through negative implication) 'any possibility of implied conflict preemption.'" <u>Geier</u>, 529 U.S. at 869 (quoting <u>Freightliner Corp.</u> v. <u>Myrick</u>, 514 U.S. 280, 288 (1995) (bracketing by the Court and further citation omitted)); <u>see also</u> <u>Sprietsma</u> v. <u>Mercury Marine</u>, 537 U.S. 51, 65 (2002). Philip Morris maintains that <u>Cipollone</u> and <u>Harshbarger</u> thus pose no obstacle to its implied preemption claim.

-43-

By the time we decided <u>Harshbarger</u>, however, the Supreme Court had already made clear in <u>Freightliner</u> that "[a]t best, <u>Cipollone</u> supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." 514 U.S. at 289.  Yet we did not read <u>Freightliner</u>--which considered the preemptive effect of a safety standard for trucks promulgated under the National Traffic and Motor Vehicle Act of 1966 ("NTMVSA"), 514 U.S. at 283-86--to cast doubt on <u>Cipollone</u>'s view that the presence of an express preemption clause <u>in the FCLAA</u> rules out expanding its preemptive reach through implied preemption principles.[22]  <u>Harshbarger</u>, 122 F.3d at 78.  Moreover, <u>Freightliner</u> explained that the <u>Cipollone</u> Court had, notwithstanding that view, nevertheless "engaged in a conflict preemption analysis of the [FCLAA], and found 'no general, inherent conflict between federal preemption of state warning requirements and the continued vitality of state common-law damages actions.'"  514 U.S. at 288-89 (quoting <u>Cipollone</u>, 505 U.S. at 518).

Given this alternative basis for <u>Cipollone</u>'s holding that the FCLAA does not implicitly preempt state-law claims arising out

---

[22]We nevertheless declined to forego implied preemption analysis altogether in reliance on <u>Cipollone</u>, because the state disclosure requirements had been challenged in part on the basis of amendments to the FCLAA which <u>Cipollone</u> had not considered.  122 F.3d at 78. These amendments, effectuated through the Comprehensive Smoking Health Education Act of 1984, Pub. L. 98-474,  98 Stat. 2200, did not change the FCLAA in any manner relevant to our analysis here, and neither side has argued to the contrary.

of cigarette advertisements or promotions, it remains good law regardless of what the Court has since said, in other contexts, about the effect of express preemption clauses on implied preemption. Furthermore, we see nothing in either Geier or Sprietsma--which, like Freightliner, did not consider the preemptive effect of the FCLAA, but other federal statutes with express preemption provisions--suggesting that the Cipollone Court was wrong to draw an inference against implied preemption of state-law challenges to cigarette advertising from the presence of an express preemption provision in the FCLAA, as opposed to those other statutes. Just as in Harshbarger, then, "[w]e are bound by the Cipollone majority's holding that § 1334(b) governs the preemptive scope of the FCLAA" and, therefore, "we are not at liberty to address any implied preemption theories" premised on the statute. 122 F.3d at 78.

Philip Morris also founds its implied preemption claim on the FTC's oversight of cigarette advertising under the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. (1997). We agree that neither Cipollone nor Harshbarger bars this argument, because those cases considered the preemptive effect of only the FCLAA, which did not "limit, restrict, expand, or otherwise affect the authority of the [FTC] with respect to unfair or deceptive acts or practices in the advertising of cigarettes." 15 U.S.C. § 1336. But we do not agree that the FTC's exercise of its authority in this area has

preempted state-law damages actions, like this one, alleging that a cigarette manufacturer has engaged in such acts or practices through its use of the terms "light" and "lower tar and nicotine."

In brief, the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a), and empowers the Commission both to define and enforce that prohibition in a number of ways relevant here. The Commission may prescribe either informal "interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices," id. § 57a(a)(1)(A), or, pursuant to notice-and-comment procedures, see id. §§ 57a(b)-(e), formal rules which define those acts and practices "with specificity," id. § 57a(a)(1)(B). In addition, the Commission may issue cease-and-desist orders against those engaged in violations of the Act. Id. § 45(b). The FTC may enforce such orders--as well as its formal rules--by suing violators for either civil penalties, id. § 45(m), or "such relief as the court finds necessary to redress injuries to consumers" or other injured parties, id. §§ 57b(a),(b).

The FTC has regularly trained these powers on tar and nicotine claims in cigarette advertising; as the district court observed, "the tobacco industry is hardly unregulated in what it says to consumers about its products, including light cigarettes." 436 F. Supp. 2d at 151. But we reject the suggestion--and we describe it that way because, as we have noted, Philip Morris does

-46-

not purport to make a field preemption argument--that the degree of federal regulation over a particular industry, no matter how "comprehensive" or "detailed," can itself displace state law.[23] As the Supreme Court has cautioned, to "infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state imbalance embodied in our Supremacy Clause jurisprudence." Hillsborough County, 471 U.S. at 717. Instead, under the established rules of conflict preemption we have recited, we must determine whether the FTC's oversight of tar and nicotine claims manifests a federal policy intended to displace conflicting state law.

---

[23]In support of this point, Philip Morris's brief relies heavily on the Eighth Circuit's decision in Watson v. Philip Morris Cos., 420 F.3d 852 (8th Cir. 2005), rev'd, 127 S. Ct. 2301 (2007), which held that the FTC's detailed supervision of the cigarette testing process gave rise to federal removal jurisdiction over a lawsuit similar to this one on the theory that it was an action against a party "acting under" a federal officer pursuant to 28 U.S.C. § 1442(a)(1) (2006). This decision, however, was recently reversed by the Supreme Court; Philip Morris now says that the Court's "holding regarding [§] 1442(a)(1) removal has little to do with the issues" before us. We agree, and think that the same was true of the Eighth Circuit's holding to begin with. Philip Morris also makes much of the fact that the "Supreme Court had no problem 'assuming' the regulatory facts" underlying the implied preemption argument here, but we consider many of the same facts infra and find them insufficient to support Philip Morris's position. We see no need, then, to discuss either the Supreme Court's or the Eighth Circuit's Watson decision further.

As we have discussed, the FTC advised the tobacco industry in 1966 that it could make "factual statements" of tar and nicotine content, so long as they "were supported by adequate records of tests conducted in accordance with the Cambridge Filter Method." Press Release, Fed. Trade Comm'n (Mar. 25, 1966). The FTC soon began to assess such claims by conducting its own tests of cigarettes under the method, and proposed a formal rule requiring cigarette manufacturers to disclose the results of those tests in their advertisements. The proposal was put on hold, however, when the manufacturers agreed to make those disclosures voluntarily.

Before entering into this agreement, the FTC had sought a cease-and-desist order against The American Tobacco Company, charging that ads for certain brands of its cigarettes deceitfully created the impression that they were "low in tar" when they in fact contained more tar than the average brand per then-current FTC test results. This charge was resolved through a 1971 consent order forbidding American from "advertising that any cigarette manufactured by it, or the smoke therefrom, is low or lower in 'tar' by use of the words 'low,' 'lower,' or 'reduced' or like qualifying terms, unless the statement is accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content in milligrams in the smoke produced by the advertised cigarette." In re Am. Brands, Inc., 79 F.T.C. 255, 258 (1971) (internal formatting omitted). For purposes of the order, "tar and nicotine content"

was defined as "determined by the [FTC] in its testing," i.e., per the Cambridge Filter Method.[24]  Id. at 259.

Based principally on these exercises of authority over tar and nicotine claims, Philip Morris argues that the FTC has expressed a "policy of allowing their use so long as substantiated with the FTC Method numerical results and requiring publication of those results in all brand advertisements."  Because the plaintiffs' claims "stand[] as an obstacle" to this policy, Philip Morris continues, they are implicitly preempted.  Like the plaintiffs, we see a number of problems with this argument.

First, since its 1969 agreement with the tobacco companies, the FTC has never issued a formal rule specifically defining which cigarette advertising practices violate the Act and which do not.  As the plaintiffs point out, there is some authority for the proposition that "[s]tate prohibitions of unfair and deceptive practices are not preempted unless they conflict with an express FTC rule."  United States v. Philip Morris, Inc., 263 F. Supp. 2d 72, 78 (D.D.C. 2003) (emphasis omitted); see also

_____

[24]As the result of a subsequent cease-and-desist action against American, the company entered into another consent order with the FTC.  In re American Tobacco Co., 119 F.T.C. 3 (1995).  While this order limited American's ability to make certain kinds of tar and nicotine claims, see infra note 26, the order also allowed the company, subject to certain restrictions, to compare the tar and nicotine ratings of its brands to those of other brands "with or without an express or implied representation that [its] brand is 'low,' 'lower,' or 'lowest' in tar and/or nicotine."  Id. at 11 (parentheses omitted).

Katharine Gibbs Sch., Inc. v. FTC, 612 F.2d 658, 667 (2d Cir. 1979); Wisconsin v. Amoco Oil Co., 293 N.W.2d 487, 496 (Wis. 1980); accord Wabash Valley Power Ass'n v. Rural Electrification Admin., 903 F.2d 445, 454 (7th Cir. 1990) (declining to give preemptive effect to agency action taken without regard to formal rulemaking procedures); Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170, 196 (3d Cir. 1995) (Nygaard, J., dissenting). Other courts, however, have held that an agency can preempt state law through action short of formal rulemaking. See, e.g., Elizabeth Blackwell Health Ctr., 61 F.3d at 182-83 (HHS interpretive rule); Feikema v. Texaco, Inc., 16 F.3d 1408, 1418 (4th Cir. 1994) (EPA consent order); Gen. Motors Corp. v. Abrams, 897 F.2d 34, 39 (2d Cir. 1990) (FTC consent order); Dowhal v. SmithKline Beecham Consumer Healthcare, 88 P.3d 1, 9-10 (Cal. 2004) (FDA letters to drug manufacturers).

Unlike many other exercises of agency authority, formal rulemaking comes with a host of procedural protections under the Administrative Procedure Act ("APA"), such as notice of the proposed rule, an opportunity for interested parties to participate, a statement of the basis and purpose of any rule adopted, and its publication in the Federal Register. 5 U.S.C. § 533 (2007). Limiting the preemptive power of federal agencies to exercises of formal rulemaking authority, then, ensures that the states will have enjoyed these protections before suffering the

displacement of their laws. See, e.g., Wabash Valley Power Ass'n, 903 F.2d at 453-54; Richard J. Pierce, Jr., Regulation, Deregulation, Federalism and Administrative Law, 46 U. Pitt. L. Rev. 607, 664-65 (1985). This reasoning has particular force in the case of the FTC Act, which imposes procedural requirements on the Commission's rulemaking powers that exceed those of the APA. 15 U.S.C. §§ 57(c)-(e). Indeed, courts and commentators have understood these additional safeguards to reflect a congressional concern--well-documented in their legislative history--over the preemptive effect of FTC regulation on state consumer protection law. See Am. Fin. Servs. Ass'n v. FTC, 767 F.2d 957, 989-90 & n.41 (D.C. Cir. 1985); Katharine Gibbs, 617 F.2d at 677; Paul R. Verkuil, Preemption of State Law by the Federal Trade Commission, 1976 Duke L.J. 225, 243 (1976); Pierce, supra, at 638-40.

Second, apart from the likely import of its rulemaking provisions, the FTC Act raises an additional hurdle to Philip Morris's implied preemption theory, at least insofar as that theory relies on the 1971 and 1995 consent orders. The Act states that "[r]emedies provided in [15 U.S.C. § 57b] are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law." 15 U.S.C. § 57b(e). And § 57b, as we have observed, empowers the Commission to sue for relief on behalf of consumers against those who violate its cease-and-desist orders against unfair or deceptive acts or practices. We do not think it

-51-

a stretch, then, to say that when the FTC merely issues such an order, but never uses it as the basis for a subsequent lawsuit, the order does not supplant state-law rights of action any more than the lawsuit would have. A number of authorities have reached the same conclusion, though not necessarily by way of the same rationale. See California v. Am. Stores Co., 872 F.2d 837, 843-44 (9th Cir.), rev'd on other grounds, 495 U.S. 916 (1989); Louisiana ex rel. Guste v. Fedders Corp., 543 F. Supp. 1022, 1024 (M.D. La. 1982); Arvin Indus. v. Maremont Corp., 1973-1 Trade Cases ¶ 74,416, 1973 WL 784, at *3 (S.D. Ind. Mar. 9, 1973); 1 Stephanie W. Kanwit, Federal Trade Commission § 12:6 (2006); but see Gen. Motors Corp., 897 F.2d at 39 (holding that an FTC "consent order reflecting a reasonable policy choice and issued pursuant to a congressional grant of authority may preempt state legislation").

Relying on the Supreme Court's decision in Geier, Philip Morris argues that § 57b(e), which it calls a "savings clause," "does not bar the ordinary working of conflict pre-emption principles." 529 U.S. at 869. Geier held that the savings clause of the NTMVSA, which provides that "'[c]ompliance with' a federal safety standard 'does not exempt any person from liability under common law,'" id. at 868 (quoting 15 U.S.C. § 1397(k) (1988)), did not preserve "state-law tort actions that conflict with federal regulations." Id. at 869. The Court reasoned that "[t]he words 'compliance' and 'does not exempt' sound as if they simply bar a

-52-

special kind of defense, namely, a defense that compliance with a federal standard automatically exempts a defendant from state law, whether the Federal Government meant that standard to be an absolute requirement or only a minimum one." Id. (citation omitted). Thus, the Court explained, the federal standard would displace conflicting state law in the former case, but not the latter, where a plaintiff remains free to argue for a higher state-law standard as envisioned by the savings clause. Id. at 870.

But unlike the savings clause of the NTMVSA, § 57b(e) does not speak of compliance with a federal standard as a defense to a state-law claim, leaving open the possibility of a preemptive conflict between the standard and the claim. Instead, § 57b(e) specifically provides that state-law rights of action survive the FTC's efforts at judicial enforcement of its own federal standards: in other words, that those efforts are "in addition to, and not in lieu of" other available remedies. We can think of no other purpose for this clause other than to allow further relief from unfair or deceptive acts or practices under state law even after the Commission has already challenged them through litigation under the FTC Act, and Philip Morris does not suggest any. Cf. Geier, 529 U.S. at 870 (noting that Court's reading of the NTMVSA's savings clause did not "conflict with the purpose of the saving provision, say, by rendering it ineffectual").

This reading of § 57b(e), moreover, does nothing to diminish the FTC's power to preempt state law through other assertions of its authority. After entering into a consent order, for example, the Commission remains free to adopt its terms as a formal rule, 15 U.S.C. § 57a(b)(1); as we have discussed, this process affords states and other interested parties with the kinds of procedural protections usually deemed essential to regulatory preemption. See, e.g., Wabash Valley Power Ass'n, 903 F.3d at 454. We acknowledge, as Philip Morris points out, that an agency often prefers to formulate policy through case-by-case adjudication, rather than rulemaking, and that adjudicated cases "generally provide a guide to action that the agency may be expected to take in future cases." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 756-66 (1969) (plurality opinion). "But this is far from saying . . . that commands, decisions, or policies announced in adjudications are 'rules' in the sense that they must, without more, be obeyed by the affected public." Id. Indeed, the FTC Act itself reflects this distinction, at least with regard to consent orders: it specifically provides that the Commission cannot enforce them against non-parties.[25] 15 U.S.C. § 45(m)(1)(B). So we do not believe that the FTC can preempt state-law actions arising out of particular practices simply by entering into a consent order

---

[25]Similarly, when seeking relief on behalf of consumers for violation of a consent order, the FTC may proceed against the parties to the order only. 15 U.S.C. § 57b(a)(2).

-54-

allowing them to continue.  See Am. Stores, 872 F.2d at 843 (ruling that consent decree, which resolved FTC's challenge to corporate merger under FTC Act by requiring partial asset divestiture, did not bar challenge to merger by state, which "may have different interests than does the FTC in protecting its citizens from antitrust violations").

Third, as the one court squarely holding that FTC consent orders can preempt state law has recognized, the mere entry of such an order dealing with a particular practice "is insufficient to preclude supplemental state regulation."  Gen. Motors Corp., 897 F.2d at 39.  Thus, even if we were to agree that FTC action short of formal rulemaking--including consent orders--can implicitly preempt state law in some cases, we do not think that this is one of them, because the plaintiffs' state-law claims do not pose a threat to any federal regulatory objectives apparent in the FTC's approach to tar and nicotine claims in cigarette advertising.

Though Philip Morris argues that FTC policy permits a manufacturer to make such claims so long as they are consistent with the results of testing under the Cambridge Filter Method and those results are disclosed in the manufacturer's advertising, the Commission has on occasion challenged statements about the tar or nicotine content of a particular brand even though they were supported by such testing.  In 1982, for example, the FTC told a cigarette manufacturer that it could not rely on the Cambridge

Filter Method to substantiate claims that one of its brands had only 1 milligram of tar, because the method did not accurately measure the tar and nicotine content of that brand due to its unusual filter design.  See FTC v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 37-39 (D.C. Cir. 1985). The FTC has also challenged a manufacturer's advertisements "that consumers will get less tar by smoking ten packs of [its] brand cigarettes than by smoking a single pack of the other brands of cigarettes depicted in the ads," since the claim was based on "ratings obtained through smoking machine tests that do not reflect actual smoking, in part because the machines do not take into account such behavior as compensatory smoking."  In re Am. Tobacco Co., 119 F.T.C. at 4.[26]

---

[26]In the consent order resolving this charge, American agreed to refrain from representing, through certain comparisons of the tar ratings of any of its brands to those of other brands, "that consumers will get less tar by smoking ten packs of any cigarette rated as having 1 mg. of tar than by smoking a single pack of any other brand of cigarettes that is rated as having more than 10 mg. of tar." 119 F.T.C. at 10.  But the order preserved American's ability otherwise to compare the tar and nicotine ratings of its brands to those of other brands, provided "such representation is true and, at the time of making [it], [American] possesses and relies upon reliable scientific evidence that substantiates the representation." Id. at 10-11.  Philip Morris characterizes this part of the order as permitting tar and nicotine claims so long as they are substantiated by the Cambridge Filter Method.  If this is the case, we wonder why the FTC did not simply identify the method by name instead of calling it "reliable scientific evidence," but, in any event, the interpretation of this particular aspect of the 1995 consent order does not affect our conclusion that the FTC's decision to challenge American's ads in the first place shows that it has not given its blessing to all Cambridge Filter Method-supported tar and nicotine claims.

The FTC, then, has not invariably allowed tar and nicotine claims that are supported by the Cambridge Filter Method, but has recognized that such claims may nevertheless amount to unfair or deceptive acts or practices in certain circumstances. We acknowledge that the claim at issue here--that Marlboro and Cambridge Lights have "lower tar and nicotine" than their full-flavored versions--differs from those the FTC has challenged in the past, but our task is not to decide whether the FTC would view a particular kind of tar and nicotine claim as a violation of the FTC Act.[27] Instead, we must determine whether the FTC's oversight of such claims "convey[s] an authoritative message of a federal policy" jeopardized by the plaintiffs' common-law damages action. Sprietsma, 537 U.S. at 67. Because the only policy we perceive is that certain tar and nicotine claims consistent with Cambridge Filter Method test results can still amount to unfair or deceptive acts or practices, we think not.

We derive additional support for this conclusion from Geier and Sprietsma.[28] Geier ruled that a state-law tort action

[27]In Part II.C, infra, we consider whether the FTC "permitted" the claims at issue so as to exempt them from the coverage of the Maine Unfair Trade Practices Act.

[28]Philip Morris intimates that the plaintiffs have waived any argument based on Sprietsma because they did not rely on it below. Though the plaintiffs did not cite the case to the district court, they did argue that "no federal purpose or objective would be frustrated by a finding of liability against Defendants in this case." In taking up this argument on appeal, then, we are free to consider Sprietsma--which, after all, is binding Supreme Court

alleging that the defendant had negligently designed the plaintiff's 1987 car without airbags would frustrate the purpose of a federal regulation "requir[ing] auto manufacturers to equip some but not all of their 1987 vehicles with" such devices. 529 U.S. at 864-67. Based on its review of the administrative record of the regulation in question and a brief from the Solicitor General explaining the agency's position, the Court identified the federal purpose as a "policy judgment that safety would be best promoted if manufacturers installed alternative protection systems in their fleets rather than one particular system in every car." Id. at 881 (internal quotation marks omitted). Conversely, in Sprietsma, the Court declined to infer that the Coast Guard's decision not to enact a rule under the Federal Boat Safety Act ("FBSA") requiring propeller guards on recreational boat engines preempted a state-law tort suit premised on the lack of such a device. 537 U.S. at 67. As the Court saw it, the Coast Guard's decision did not reflect "a federal policy against propeller guards," id. at 67, but simply "a judgment that the available data did not meet the FBSA's 'stringent' criteria for federal regulation." Id. at 66. As in Geier, the Court based this conclusion on the agency's explanation for its decision, as well as an amicus brief from the Solicitor General explaining its position. Id. at 66-68.

---

authority. See, e.g., Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc., 399 F.3d 89, 100 n.7 (1st Cir. 2005).

Geier and Sprietsma, then, teach that it is not the fact of agency action on a particular subject alone--but the reasons for the action--that control its preemptive effect. And here, no clear rationale emerges from the history of the FTC's treatment of tar and nicotine claims; indeed, the parties point to conflicting statements by the Commission itself on whether it even has an official position on the definitions of the terms "light" and "lower tar and nicotine." Compare, e.g., 62 Fed. Reg. 48,158, 48,163 (Sept. 12, 1997) ("There are no official definitions for these terms") with, e.g., 1980 FTC Rep. to Congress 18 n. 11 ("The FTC has not defined . . . any term related to tar level except for 'low "tar"', which the FTC defines as 15.0 mg or less 'tar.'"). Moreover, as in Sprietsma and in contrast to Geier, the Solicitor General recently filed a brief in the Supreme Court explaining that the FTC "has never promulgated definitions of terms such as 'light' and 'low tar'" and that its previous statements purporting to define them "did not reflect an official regulatory position." Br. for United States as Amicus Curiae Supporting Petitioners, Watson v. Philip Morris Cos., 127 S. Ct. 2301 (2007) (No. 05-1284), 2006 WL 3694382, at *4. On this record, we cannot discern a coherent federal policy on low-tar claims, let alone one driven by the sort of "important means-related federal objectives" necessary to preempt conflicting state law. Geier, 529 U.S. at 881; cf. Int'l Paper Co. v. Ouellete, 479 U.S. 481, 497 (1987) (finding conflict

between Clean Water Act and inconsistent state law where "[i]t would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure") (emphasis added). The plaintiffs' claims are not implicitly preempted.

## C.

Finally, Philip Morris argues that its challenged advertising practices constitute "[t]ransactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under the statutory authority of the United States" and, as such, are excepted from the Maine Unfair Trade Practices Act. Me. Rev. Stat. Ann. tit. 5, § 208(1). This argument, like Philip Morris's implied preemption theory, depends largely on its characterization of FTC policy to allow the use of the terms "light" and "lower tar and nicotine" when supported by testing under the Cambridge Filter Method. And, as we have explained, we disagree with that characterization: the full history of the FTC's oversight of tar and nicotine claims reveals its view that, depending on the circumstances, those claims can be unfair or deceptive notwithstanding their support in Cambridge Filter Method test results. See, e.g., Brown & Williamson Tobacco Corp., 778 F.2d at 37-39; In re Am. Tobacco Co., 119 F.T.C. at 4.

We disagree, then, with those courts holding that the FTC has "authorized" Philip Morris's "light" and "lower tar and nicotine" claims so as to put them beyond the reach of state consumer protection statutes with exceptions similar to Maine's. See Flanagan v. Altria Group, Inc., No. 05-71697, 2005 WL 2769010, at *6 (E.D. Mich. Oct. 25, 2005); Price, 848 N.E.2d at 50; see also Sullivan v. Philip Morris USA, Inc., No. 03-796, 2005 WL 2123702, at *9 (W.D. La. Aug. 31, 2005) (finding "light" and "lower tar and nicotine" claims to constitute "conduct that complies with" 15 U.S.C. § 45(a)(1) and therefore exempt from Louisiana Unfair Trade Practices and Consumer Protection Act). In our view, these decisions overlook the subtleties in the Commission's approach to tar and nicotine claims we have already discussed.

The court in Price, for example, concluded that the FTC, through its 1971 and 1995 consent orders with American Tobacco, "could, and did, specifically authorize all United States tobacco companies to utilize the terms 'low,' 'lower,' 'reduced' or like qualifying terms such as 'light' so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content in milligrams of the smoke produced by the advertised cigarette." 848 N.E.2d at 50. As we have explained, though, the American Tobacco consent orders may have provided guidance to the rest of the industry on how the Commission would likely view such claims in the future, but they by no means

reflected an across-the-board approval of the use of the descriptors alongside the tar and nicotine ratings. And again, had the FTC intended to "authorize" those kinds of advertisements, it needed only to exercise its rulemaking authority to that end.[29] That the Commission has not done so is reason enough to doubt the conclusions of <u>Price</u> and other courts that the FTC's handling of "light" and "lower tar and nicotine claims" has removed them from the purview of state consumer protection laws.

Furthermore, even if the consent decrees did "authorize" particular tar and nicotine claims for purposes of state consumer protection laws, that authorization does not appear to extend to the claims at issue here. Insofar as the 1971 consent decree permits "use of the words 'low,' 'lower,' or 'reduced' or like qualifying terms," it does so only if "the statement is accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content in milligrams in the smoke produced by the advertised cigarette" per the Cambridge Filter Method. <u>In re Am. Brands,</u>

---

[29]Indeed, Philip Morris, while maintaining that "[t]he FTC has specifically permitted the use of descriptors . . . that reflect the Cambridge Method's yield measurements," has nevertheless asked it to "adopt a rule expressly authorizing the industry to continue to use such descriptors" if accompanied by "disclaimers" about compensation and in accordance with "uniform" definitions of the terms to correspond to particular tar ratings. Petition for Rulemaking at 4, 34, <u>In re Petition for Rulemaking Concerning Tar and Nicotine Testing and Disclosure</u> (F.T.C. Sept. 18, 2002), <u>available at</u> http://www.ftc.gov/os/comments/philipmorrisconabisco/ philipmorrispetition.pdf. The FTC has yet to rule on the petition.

Inc., 79 F.T.C. at 258 (internal formatting omitted).  But, as the plaintiffs point out, Philip Morris uses the terms "light" and "Lowered Tar and Nicotine" on the packages of Marlboro and Cambridge Lights without mentioning their tar and nicotine ratings.  Philip Morris responds that the FTC could not have mandated those disclosures on the packages because, under the FCLAA, "[n]o statement relating to smoking and health, other than the [health warnings] required by [15 U.S.C. § 1333], shall be required on any cigarette package."[30]  15 U.S.C. § 1334(a).

We see at least two weaknesses in this position.  First, as we have noted, the FCLAA also provides that "[n]othing in this chapter (other than the requirements of [15 U.S.C. § 1333]) shall be construed to limit, restrict, expand, or otherwise affect the authority of the [FTC] with respect to unfair or deceptive acts or practices in the advertising of cigarettes."  15 U.S.C. § 1336.  So it is at least arguable that the restriction on additional health-related statements in the FCLAA does not apply to the FTC.  See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 185 (2000) (Breyer, J., dissenting).  Second, if the portion of the 1971 consent order requiring disclosure of tar and nicotine yields does not apply to cigarette packages, then, it would seem to us, neither does the portion of the order permitting the use of the

---

[30]Philip Morris does not argue that the 1995 American Tobacco consent order relaxed the requirements of the 1971 order, so we do not separately discuss the 1995 order here.

descriptors.  Otherwise, the order would have allowed American Tobacco to label its cigarettes as low tar without disclosing that they in fact had more tar than the average cigarette--in essence, to continue the same allegedly deceptive practice that led the FTC to seek the order in the first place.  We have great difficulty reading the consent order in such a self-defeating manner.[31]

We do not mean to suggest that the consent orders have no bearing at all on whether Philip Morris's use of the terms "light" and "Lowered Tar and Nicotine" violates the Maine Unfair Trade Practices Act.  Indeed, the Act provides that, in construing its ban on unfair or deceptive acts or practices, "courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to [15 U.S.C. § 45(a)(1)], as from time to time amended."  Me. Rev. Stat. Ann. tit. 5, § 207; see, e.g., Searles v. Fleetwood Homes of Pa., Inc., 878 A.2d 509, 520 (Me. 2005) (relying on FTC consent decree to determine whether particular practice was unfair under § 207).  But whether Philip Morris's challenged statements fit the statutory proscription is not the question before us.  We conclude simply that those

---

[31]The court in Price read the 1971 consent order to authorize Philip Morris's use of the descriptors sans disclosures on the theory that the disclosure requirement "applies only when the manufacturer is making a direct comparison between its brand of cigarettes and a competing brand."  848 N.E.2d at 37.  Philip Morris does not rely on that reading here.  As we have said, however, we take the view that, because the disclosure requirement is essential to the order, if it does not apply in a certain context, than neither does any "authorization" of the descriptors.

statements are not "authorized" by the consent orders or anything else in the FTC's approach to tar and nicotine claims so as to exempt them from the Act. See Mulford, 2007 WL 1969734, at *29; Aspinall v. Philip Morris Cos., Civ. A. No. 98-6002, 2006 WL 2971490, at *8 (Mass. Super. Ct. Aug. 9, 2006), rev. granted, No. SJC-09981 (Mass. Apr. 25, 2007).

Finally, in an echo of its implied preemption argument, Philip Morris posits that, even if the consent orders did not authorize the tar and nicotine claims at issue here, the FTC's "comprehensive, detailed regulation of cigarette advertising and promotion" suffices to exempt them from the Maine Unfair Trade Practices Act (internal quotation marks omitted). The Act, however, exempts "[t]ransactions or actions otherwise permitted" (emphasis added), not "otherwise regulated." Cf. Mary Dee Pridgen, Consumer Protection and the Law § 4:32 (1986 & 2006 supp.) (contrasting consumer protection statutes exempting "actions or transactions otherwise . . . regulated" with those exempting "only those activities 'permitted'").

Unlike Philip Morris, we do not believe that the Maine Supreme Judicial Court equated these two concepts in First of Maine Commodities v. Dube, 534 A.2d 1298 (Me. 1987). There, the plaintiffs claimed that the defendant real estate broker had violated the Maine Unfair Trade Practices Act by failing to notify them of their purported right under another statute to void the

parties' exclusive listing agreement within three days of its execution. Id. at 1301. The court observed that the Maine Real Estate Commission "may investigate and penalize licensed brokers who violate the numerous statutory restrictions on their activities," including one imposing specific standards on exclusive listing agreements--but not the three-day voiding option the plaintiffs sought to enforce. Id. at 1301 (citing Me. Rev. Stat. Ann. tit. 42 § 4004 (1978 & 1986 supp.). Thus, the court concluded that "[b]ecause by statute the Maine Real Estate Commission extensively regulates brokers' activities, including the execution of exclusive listing agreements, such activities fall outside the scope of Maine's Unfair Trade Practices Act." Id. at 1302.

We read First of Maine Commodities, then, for the proposition that conduct is exempt from the Unfair Trade Practices Act where it is subject to specific standards left to the enforcement of an administrative agency, not merely those circumstances in which the agency's regulatory scheme is generally "extensive" or "detailed." See also Weinschenk, 868 A.2d at 205 (rejecting argument that § 208(1) exempted builder's sales of homes "because industry operations are separately regulated by state or federal law"). As we have discussed, the FTC does not appear to have imposed specific standards on tar and nicotine claims in cigarette advertising; even if it has, the plaintiffs here, in contrast to the plaintiffs in First of Maine Commodities,

do not seek to hold Philip Morris liable under the Unfair Trade Practices Act for complying with those standards. Neither First of Maine Commodities nor the language of § 208(1) itself supports Philip Morris's argument that its use of the terms "light" and "Lowered Tar and Nicotine" is a "transaction[] or action[] otherwise permitted under laws administered by any regulatory board or officer" exempt from the Maine Unfair Trade Practices Act.

## III.

In summary, we conclude that the plaintiffs' claims that Philip Morris has made fraudulent misrepresentations in violation of the Maine Unfair Trade Practices Act by advertising and promoting Marlboro and Cambridge Lights as "light" and having "Lowered Tar and Nicotine" are not (1) expressly preempted by the FCLAA, (2) implicitly preempted, either by the FCLAA or by the FTC's oversight of tar and nicotine claims in cigarette advertising, or (3) barred by the Act's exemption for "transactions or actions otherwise permitted." We do not, of course, reach any conclusion on the merits of the plaintiffs' claims, the availability of summary judgment on other grounds, or the force of or any other defense potentially available to Philip Morris; and nothing in what we have said should be construed as expressing any views on those issues that are not before us. As always, "we leave the extent and nature of further proceedings in the hands of the district court." Patterson v. Patterson, 306 F.3d 1156, 1162 (1st

Cir. 2002).  We **vacate** the judgment of the district court and **remand** for further proceedings.

**So ordered.**